After advisement the following opinions were delivered:
x>v Liie Chancellor*. ^'/The relator in this case has shown himself entitled to so much of the fall m the middle sprout of the Mohawk as belonged to the manor of Bensselaerwyck under the grant to the ancestor of the patroon. The general terms of that grant are of all that tract or tracts of land called Bensselaerwyck, lying and being in and upon the banks of the Hudson’s river between a line running east and west through the south end of Bearen island, and another line running east and west through the Cahoes falls, and to extend back from the banks of the river, on each side, twenty four English miles. It is supposed that the words extending up along both sides of the river to the Cahoes, were intended to exclude the islands in the river, and the bed of the stream above tide water, as well as below; and also to exclude all the land upon the west bank of the river between i.ts junction with the southerly sprout of the Mohawk to the Cahoes falls: which falls, in the patent, are erroneously described as being on the Hudson’s river. It would be difficult, however, to extend the boundry of the land granted up along the east side of the river to the Cahoes. This expression, therefore, was merely intended to designate the Cahoes falls at a point in the north line of the patent, to 'which the grant was to extend in that direction, in the same manner as Bearen island, situated in the middle of the Hudson on the south, is designated as the place of beginning or south bounds of the premises granted. The terms, extending itself baok into the woods twenty-four English miles from each side of the river, where evidently not inserted in the grant for the purpose of excluding any part of the islands or lands lying in the river, which could be property conveyed by such a grant; but they were inserted for the purpose of locating the east and west lines of the patent and showing how far the manor was to extend back on each side of the river. And when [581] we take into consideration the concluding words of the grant, specifying every the isles, islands, rivers, creeks, runs of water and all other royalties, except royal mines, together with franchises, harbors, &c.; which royalties, franchises and harbors were part ofthe regalia or reserved rights of the crown not usually inserted in grants to individuals, I think there can not be any possible doubt that it was the intention of the crown, as the grantor, to include whatever was contained within the outer lines of the patent: that Is, between the two lines twenty-four miles from the bank of the river on the east and west, and the other two lines drawn through to Cahoes falls on the north and Bearen island on the south; so far as the lands and manorial rights included within those limits could be properly conveyed by such a grant consistent with the public rights of navigation which were inalienable by the crown; and so far as the premises described were not already included within the bounds of some previous grant or patent.
If there could have been any doubt originally, as to the true construction of the terms of this grant, it has been put at rest by the acts of ownership which the patentee and those claiming under him have exercised over the islands in the Hudson, and particularly, over this island on the west bank of the Hudson, formed by the sprouts of the Mohawk, which was not included in *327 the previous grant to Schuyler & Garretse of Van Schaick’s island; and also in the bed of the southern sprout of the Mohawk, above the head of navigation thereon, from time immemorial. So far as relates to the island and place in question, which never was in the alveus or bed of the Hudson, but clearly within the bounds of the grant, even if the patent is limited to the banks or margin of that stream on both sides, it appears that Green island, under which the relator claims the right to the centre of the middle sprout of the Mohawk, was granted by the patentee to Peter Schuyler in 1708, about twenty years after the first patent to Van Rensselaer, and only four years after the date of the patent of confirmation; under which conveyance it has ever since been held. This is certainly a practical construction and location of the manorial grant almost cotemporaneous with the patent itself.
The descriptive calls in the grant of the Van Schaick island, which [582] patent was i-^ued in 1665, only one year after the capitulation of the Dutch, and long before the first patent to Van Rensselaer, have been resorted: to for the purpose of showing that the colony of Rensselaerwyck did not extend north of the south point of that island. That description, however, is contradicted by the patent itself which extends it as far north as the Cahoes; and if adopted, it would equally show that the colony of Rensselaerwyck did not extend north of the city of Troy, where the south branch of the Mohawk falls into the Hudson; as that branch of the river is the first spring-beyond and above the colony of Rensselaerwyck, in the same sense that the' middle sprout is the second spring beyond and above the same. The descrip-, tion in that patent evidently imports not merely that the Van Schaick island is above and beyond the colony, but that the two branches of the Mohawk, between which that island is situated are the second and third springs beyond and above the colony. The term “ colony of Rensselaerwyck” in that grant must therefore have been intended to refer to that part of the now city of Albany which was then built upon a certain extent, and formerly known by the name of the Colonle. This then was a matter of local description merely, and was not intended to describe or locate the north bounds of the manor of Rensselaerwyck: as it had been formerly claimed by the Van Rensselaers previous to 1652, in the same manner that another small stream is, in one of the ancient statutes, described as commonly called the fifth creek. (See act of March 1772, to prevent the waste of fire wood in the county of Albany, 2 Van Schaick’s ed. of Laws, 691)- The same may be said of the Half Moon patent, which is described as lying north of the fourth spring above and beyond the-colony of Rensselaerwyck near Albany; which was granted to the same person and on the same day. As these two patents bore date more than twenty years before the first patent to the Van Rensselaers, the forth oi November, in the first year of James the second, the patentees were entitled, to hold in opposition to that grant, although the bounds of the patent of Van Rensselaer’s manor actually included a part of the same prem- [583] ises which had been previously granted to Schuyler & Garretse. There can not therefore be any doubt that Green island upon the west bank of the Hudson, together with the one half of the middle sprout, which is called, in the patent ior the Van Schaick island, the second spring, actually belonged to the ancestor of the patroon, if the common law of England in relation to grants of real estate is to control the construction of liis grant from the crown.
Even if the ordinary tides flowed a part way up this sprout, and not merely the spring tides, which no one acquainted with the situation of the premises can believe, there is no pretence that any tide ever extended up so far as to affect the falls in question; which is the only subject of complaint on the part of the relator; and if he owned the site of the fall and the bed of the stream above, that is all that is necessary to entire him to a manda *328 mus to obtain an assessment of his damages sustained by the destruction of the fall by overflowing the same—as his dam, to supply any machinery, must of necessity be placed above the fall, and of course above the highest possible influence of the tide, even at the spring tide.
//Tt is insisteB]3¡hovveveij that grants of land in this state bounding upon water courses, must, in tneir construction, be governed by the rules of civil law, and not by the well known and established principles which regulated the construction of such grants by the laws of England at the time of the patent to Van Rensselaer; and that by the rules of the civil law, the alveus or bed of all perennial streams, whether navigable or otherwise, belonged to the people at large; or at least that this grant to Van Rensselaer must be governed by this supposed rule of the civil law. These questions I will next proceed to consider.
Until the former argument of this cause I had not supposed that any one seriously contended that the Roman Dutch law, which was brought here by the original settlers from Holland, in 1614, remained a part of the law [584] of the colony after the capitulation of Governor Stuyvesant. I also supposed it was generally conceded that the province of New York was claimed by the English by right of discovery, and not by the right of conquest; and therefore, that when it was taken possession of as an English colony under the duke of York, in 1664, no formal act was necessaiy to substitute the common law of England in the place of that law by which the Dutch settlers had previously been governed. In a colony acquired by discovery and occupancy merely, and not by conquest or cession, the discoverers and new occupants thereof carry with them all the general laws of the mother country which are adapted to their new situation as colonists. jThese are immediately, and ipso facto, in force in the new settlement, and can not be changed except by local legislation, or by the authority of the legislative power of the parent country to which the colony remains attached. Such I have always supposed to be the situation of the law of this state as brought here by the English colonists sent out by James, Duke of York; and hence that no act whatever was necessary on the part of the duke’s government, or of the crown, to substitute the English for the Roman Dutch law; which would, perhaps, have been requisite if the. country had been acquired by right of conquest merely.
But even .if we consider this province as acquired by conquest and not by colonization and discovery, there was sufficient to show an intention on the part of the conquerers to abrogate the Dutch laws and substitute those of England in their place. Where a country is acquired by conquest, or even by cession.no formal act of legislation is necessary to change the law,but the mere will of the conquerer is to determine whether the ancient laws shall remain, or shall be changed either wholly or in pary¿».Thus when the Northern Barbarians overran Gaul, Italy, and the Rhenish Provinces, all of which previously had, to a certain extent, been subject to the Roman laws, their leaders neither adopted their own laws entirely nor retained those of the con- . quered country to their full extent, but a system of personal laws was permitted to prevail, as contradistinguished from territorial laws. Thus the .[585] Romans and their descendants were as between themselves, governed, both as to their possessions and their personal rights, by the Roman latv; the Salían Franks by the Salic law; the Lombards by the Lombardic; the Alemans, Swabians or Germans, by the Alomante law; the Franks, who in the latter years of the empire had settled upon the borders of the Rhine and in the neighborhood of Frankfort by the Ripuarian law, &c.; so that, as was stated by Bishop Agobardus, in an epistle to Louis the Fair, it often nappenéd that five men might be found traveling or sitting together, and each under a different law (See 1 Sav. Rom. Law. 100). So upon the con *329 quest of India by the Mussulman chiefs, they introduced their own law so far only as it affected the followers of the Prophet and their descendants, leaving the conquered Hindoos to enjoy their own personal laws as to themselves, their inheritances and property, substituting, however, the laws of the conquerors in all contests between Hindoos and Mussulmen, and in controversies of the latter as between themselves. Also upon the much more recent conquest of' that country by the British East India Company, the English law has been adopted as to Europeans and their descendants only, leaving the rights of the native inhabitants to be determined by their personal laws as they formerly existed, except that in controversies between Hindoos and Mussulmen the law of the defendant is to be the rule of decision instead of the Mussulmen law as theretofore (See charters for Sup. Court at Madras, 2 Strange’s Mad. Rep. 279). There is therefore in India, at this time, one law for the European and his descendants, another for the Hindoo, and a third for the followers of the Prophet; all of which frequently come before the same court for decision. If the cause is between Europeans, the judges decide according to the principles of the English law as administered in the courts of England; but if it is between Hindoos, or Mussulmen, the court must rely upon the opinions and writings of the pundits, or learned Hindoo lawyers, for the rules of law upon which the cause is to be decided; or upon those of the Molovees or Doctors of the Mohammedan law, or Muftis, as the learned jurisconsults of the Islam faith are sometimes [586] called; and so far as I have been able to discover, these different laws have been adopted in India without any legislative act of the British parliament, by the mere expression of the will of the crown alone, as signified in its charters for establishing courts of judicature, &c. So also upon the conquest of Trinidad, the Spanish law which before prevailed was permitted to remain the law of the island by the mere will of the crown, expressed in the articles of capitulation at the- time of the conquest thereof in 1797, or more probably as declared in a simple proclamation of the king, dated in 1813, declaring his will and pleasure as to what system of laws should be in force in Trinidad as a conquered colony (Clark’s Col. Laws, 307). The same may be said of British Guiana, Ceylon, and the colony at the Cape of Good Hope, -which are under the Roman Dutch law which existed there at the time of the conquest of those places respectively, except so far as altered by the king in council, or by the Royal charters or commissions to the governors, or the charters for the administration of justice in those colonies. In the island of Ceylon the Dutch law has been changed, so as to secure the right of trial by jury, by the mere grant of a new charter of justice from the crown, declaring the will of the king that such should be the law for the future. In the Mauritius the four first codes of Napoleon which had been promulgated at the time of the conquest prevail, and the ancient law of France or the custom of Paris in other respects, simply because the articles of capitulation stipulated that the inhabitants should preserve their religion and their laws which was the expression of the will of the crown concerning the laws by which the island should be governed. In a recent case which came before the newly organized court of appeals from the colonies, in England, called the judicial committee of the privy council, that court decided that the laws of England were adopted and in force at Gibraltar, which was conquered from Spain in 1704, although there had been no other act of the government abolishing the Spanish law and substituting that of England, except the king’s charter of justice, in which it was declared to be his will that the laws of England should be the measure of [587] justice to be administered between the parties as near as might be. Upon this principle alone the widow of a native inhabitant of Gibraltar, descended from Spanish parents, was declared to be entitled to dower ac *330 cording to the laws of England, although she would not have been entitled ■ to it if the Spanish law had still prevailed (Jephson v. Riera, 3 Knapp's P. C. R. 151). Although in that case it was insisted, in behalf of tl-e appellant, that the charters declaring the king’s will as to what law should govern, were not made by virtue of any orders in council, but merely in a royal grant under the great seal, as in the case of Charles to the duke of York for this province, yet the court declared that the charters of justice having been issued under the great seal, and therefore under the advice of a known responsible minister of the crown, and as the language of such charters plainly and expressly declared the will of the sovereign that the English laws should be the measure of justice in Gibraltar, the laws of England had been lawfully substituted for the laws of Spain at that place.
/'In the case under consideration there was an equally clear and decided expression of the will of the crown that the English laws should not only be the measure of justice in this colony, but also that those laws should be the rule of right in all other respects, as far as they were applicable to the colonists in their new situation. By the charter to the duke of York, of 1664, under the great seal of England, it is declared in express terms that the laws to be established in the province shall not be contrary to, but as near as may be agreeable to the laws and statutes and government of the realm of England. This charter, therefore, was in itself an explicit declaration of the king’s will that the laws\of England should be established in this colony; and absolutely deprived the duke of the power of retaining the laws of the ancient Dutch settlers, and thereby the laws of England then in force ipso facto became those of the colony, immediately upon the surrender of the Dutch to Governor Nicolls, in August of the same yearffP
As a further evidence of the power of the sovereign to change the [588] whole laws of a conquered or ceded country by a mere declaration of will without any formal act of legislation, unless there is something m the capitulation or treaty of cession to prevent his so doing, I might also add the well known fact that upon taking possession of Louisiana by the■ Spaniards, in 1765, under the treaty of cession of that colony,, made by France a few years previous, Count O’Reiley the new governor, acting in the name of the Spanish king, did, by a simple proclamation, abolish not only the form of government of the colony, but the whole code of the French law, the customs of Paris, and the ordinances of that kingdom, which had theretofore existed, and substituted the Spanish law, in their stead; immediately after which time the ancient French laws ceased to exist in the ceded province, and the laws of Spain became the legal rules both as to ■ persons and property; and so they continued until after the cession of Louisiana to the United States in 1803, and are still the laws of the states originally embraced within the limits of that colony, except so far as they have been changed by subsequent legislation.
It is insisted, however, on the part of the plaintiffs in error that although the English common law may have become the law of this colony upon the surrender of the Dutch, the patent to the Van Rensselaers in the first year of the reign of James 2d, and the subsequent confirmation thereof in 1704, were in themselves only confirmations of a previous grant to their ancestor from the government of Holland before the surrender to Governor Nicolls; and therefore must, in their construction, be governed by the laws of the government by which the first grant was made and which actually prevailed here at that time. It might be a sufficient answer to this objection to say that there is nothing in this case, neither can I find anything in the recitals of the patent, to show when or under what grant or authority from the government of the States General, Killian Van Rensselaer'and Jeremiah his son became the first settlers, planters, and improvers of the lands mentioned ia *331 the patents granted to their descendants and heirs. It is recited in the patents produced in evidence that they were the first settlers, planters and improvers under the government of the States General, and that [589] Jeremiah Van Rensselaer was lawfully, quietly and peaceably possessed thereof at the time of the surrender. But it is also stated in the recitals that from the time when the heirs of Killian Van Rensselaer, the father, had been out of possession, to wit, since 1752, divers persons had built upon some parts of the premises, whose rights were to be protected in the grant which the colonial governor was directed to make intrust for his said heirs; and it nowhere appears to whom the original grant was made by the Dutch government, if to any one; or what was the extent of such grant or the terms of it. These subsequent patents from the British crown can hardly therefore be called patents of confirmation of a former Dutch grant, so as to connect themselves therewith upon the common principles of a grant of confirmation for the purpose of controlling the construction or location of the English grants; especially as none of the Dutch grants ever were recognized by the duke’s government as having any validity of themselves. I presume, however it is true as an historical fact appearing from the ancient Dutch records, that Killian Van Rensselaer, the elder, grandfather of the patentee named in the patent of 1704, either for himself or in connection with his son Jeremiah, had some grant or written authority under the government of the States General of the united provinces, by virtue of which they claimed what was subsequently patented as the manor of Rensselaerwyck under the colonial government. Presuming, therefore, that there was originally a grant from the Dutch government for the same land, excepting those parts thereof which had been subsequently conveyed to Schuyler and Garretse by the two patents of October, 1665, which is probably a part of the premises recited as having been built upon while the heirs of Van Rensselaer were out of possession; and presuming also that the original Dutch grant was in the same terms substantially as the patent given in evidence here, I will proceed to inquire what would have been the probable construction and effect of such a grant, in relation to the premises in controversy in this suit and in relation to the fall or mill site claimed in a part of the Mohawk which never was beatable from the sea, or susceptible of [590] navigation with raffs or floats from the navigable parts of the river above the Cahoes.
In deciding what those rights were under the civil law, however, it must be recollected that we are not to be governed by the civil law as it existed in Rome itself at the time of the promulgation of the Institutes and the Code of Justinian, or the compiling of the Digest or Pandects. But those rights must be determined by the principles of the Roomsch Hollandsche Recht, or the Roman Dutch law, as it existed in Holland in 1614; mingled as it then was with the laws of those who overrun the country at a previous period, and changed in many respects by the feudal relations which existed in the Low countries between the counts or sovereign princes of Flanders and of Holland, and the mesne lords and their tenants, as well as among other nations of the continent. Although a perfect copy of the Institutes and Pandects was found at Amalfi in 1135, and the study of the civil law then commenced throughout the greatest part of Europe, it never was fully established, to the total exclusion of local and feudal laws. Even in the northern provinces of France, until the Napoleon Code reduced all the countries then under the dominion of France to one standard, the laws were materially variant from those which prevailed in the southern parts of that kingdom; and the effect of feudal institutions as well as local customs will be discovered to a considerable extent even in that code, when we compare it With the Institutes and the Justinian Code (See Bird’s Applications au Codes *332 Civil, &c). The Roman law, however, was extensively studied in the Low countries from about the close of the fifteenth century down to the time of the first settlement of the Dutch in this state, and it may be considered as at that period the fundamental law of nearly the whole continent of Europe, audit is even at this day to be taken as the law of France, Spain, Germany and the Netherlands; except where we find by the writing of the jurisconsults of those countries, or by their several written codes to which we can have recourse, that it lias been changed, or is inconsistent with their [591] respective local institutions. As it also forms the fundamental law of Scotland, we may by reference to the writings of the sages of the law in that part of the British empire, in our own language, be able the more readily to understand its principles relative to the subject now under consideration.
It is laid down in the Institutes of Justinian, as a general principle, tl^at all rivers and ports belong to the public; and also the use of the banks of rivers, as well as the sea and its shores (Harris' Just. 3d ed. p. 71, 72). And as the ancient civil law writers say that no streams are to be considered riv-. ersbut such as are perennial,as contradistinguished from those winter torrents which are dried up in summer, it is supposed by the plaintiff’s counsel that all streams are considered as public by the civil law, except those which cease to flow during the drought of summer. This is undoubtedly true, so far as the use of the running water itself is public, and so far as the riparians or heritors of the banks of the stream below are to be protected in the use of the water which naturally flow-s by or through their lands; but it was only those rivers which were capable of being used by the public for the purposes of navigation, or for the transportation of rafts and other floats, which were considered as rivers within the meaning of the rule which de elared rivers public, and the use of their banks public also. Ulpian says there is no difference between a private river and other private places (L. 1, § 4, De Fluminibus; see also 2 Westenb. Princip. Juris, 765, Lib. 43, tit. 12). Erskiue, in his Institutes of the Law of Scotland,.speaking on this subject says, it is public rivers only which are inter regalia: by which writers generally understand navigable rivers, or those on which floats may be carried to navigable rivers. Smaller streams and brooks are, according to the general opinion, jus privata, and consequently the landholder within whose bounds they run, may divert their course unless he be restrained by a servitude or other positive right in favor of an inferior tenement (2 Ersk. Inst, tit. 6, § 17, Macallan's ed. p. 327; see also 8 Shaw & Dunl. 886). So Guyot, in the Repertoire De Jurisprudence Universal, says, in relation to the [592] ancient French law on this subject, “When a river is not navigable, the owner of the land through which it passes can turn its waters and use them at his pleasure. Moreover, he can make dams in it along the whole extent of his property, provided he injure no other proprietors thereby, and that the waters are restored before going out of his grounds.” And he refers to a decision before the court of appeals at Paris in 1759, between the seignoir of Courtigney, and the seignoirs of Plissonnier and of Chappelle, in which the decision of the cause turned upon this question. He also says that even navigable rivers only belong to the crown in those parts of them which are navigable; and he refers to Henry’s report of a decree made in December. 1651, in which it was decided, in conformity with this principle, that the river Loire below Rouen, where it becomes navigable, belonged to the lord of the manor, and not to the crown. Sec also Macdonnell v. Caledonian Canal Co. (8 Shaw & Dunl. 881). In relation to the question whether rivers, not navigable, belong to the lord of the manor, or to his feudal tenants the riverains inhabiting the banks of the river, so far I presume as relates to the alveus or bed of the stream and the rights of increment, he *333 refers to the opinions of Loysel and Coquille, that streams of a certain w idth belong to the riverains, and those of a larger size to the lord of the manor or absolute owner of the fee; but he concludes that there is no general rule on the subject, the whole depending upon possession, or the nature and extent of the feudal grants to the tenants (15 Guyot’s Repert. art. Riviere, 729). The decision as to the Loire, is in point to show that the Mohawk, at the place in question, where it is clearly not navigable, or even floatable, would be considered as private property by the rules of civil law, and as belonging to the owners of the adjacent banks, although the river is navigable for very large boats a considerable distance above the Cahoes falls.
By the French law, even before the adoption of the Napoleon Code, islands which were newly formed in the bed of a navigable river belonged to the crown as the lord paramount, according to the principle of the feudal [593] system. It was not so, however, by the Roman law. By that law the islands in navigable, as well as in all other perennial streams, belonged to the riparian owners; as did also the right of increment by alluvion, or by the river forsaking its bed entirely, unless such riparian owner was limited; that is, unless he was expressly excluded from the right of increment, or was confined, in. terms, to the ancient bank of the river by his grant (Digest, Lib. 43, tit. 12, c. 6, 7; 9 Guyot's Repert. Jurisp. Univ. art. Isle ; Selden’s Mare Clausum, b. 1, ch. 22, p. 129; 3 Partida, tit. 28, law 27, 30, 31). And Pothier says, the heritages of the riverains along the sides of the stream are considered as unlimited, where they have no other boundary than the stream itself (Path. De Droit De Prop. pt. 1, ch. 2, § 3, art. 2, Paris ed. 1830, p. 161). By the Roman Dutch law, the increment belonged to the count, or feudal sovereign, as a part of his feudal rights or royalties, where he had granted the land under a restriction (roetalen). But in Holland and Zealand, the lords of manors claimed the right of increment as incident to the grant of the manor itself, though no express mention thereof was made in their letters of investiture, unless such right was expressly excluded by the terms of the grant. Such was understood to be the law by the court of accounts of the sovereignty, in 1557 and 1560 ; and it was so decided by a full college of the court of Holland (Van Leeuwen’s Com. 116). As the right of increment was a part of the regalia minora or royalties of the counts of Holland, which they might lawfully grant to an individual, I presume no doubt whatever could have existed, on the subject of the right of increments passing to the lord of the manor if his grant or letters of investiture had been as full and broad as this grant in the patent to Yan Rensselaer, which in terms contains a grant of all royalties whatsoever (except royal mines), and in which the rivers themselves were granted in express terms. The regalia majora, such as the right of the people at large to navigable streams, for the purposes of a passage or navigable communication between different parts of the [594] country, could not be granted to a subject by any words in a conveyance. But the regalia minora, such as the rights of increment in public rivers, fishings, fowlings, &c., are in fact the natural pertinents of land. They would, therefore, naturally have gone to the feudal tenant, or to a grantee of land in allodium, as such pertinents by the mere grant of the land or property to which they were so appurtenant, if they had not been, for feudal reasons alone, appropriated to the lord paramount. _ It was for such feudal reasons only that these natural pertinents of the land were considered as excepted from the grant, where the grant itself was not so certain or explicit as to show a clear intention to embrace them. By the principles of the civil law', therefore, inasmuch as the bed of a lake, or a river, or a stream, and wraters v'hieh covered it, were considered as appurtenants to each other, a grant of such stream, river, or lake, carried with it not only the water but the solum or alveus itself; although the.rule of the English law is different *334 in this'respect as to the land under waters which were navigable in the common law sense of the term. See Baird v. Robertson, 14 Shaw & Dunl. sess. ca. 396; Dix v. The Earl of Abercorn, Mor. Dict, of Dec. 12813. It was also a settled principle of the law of Holland, as stated by Van Leeuwen, in his commentaries, that he who had the right of increment, in a public river, might make dams, inclosures, or other works therein, provided they did not in any way injure the rights or interest of others, or the common navigation, which must in all cases be fully protected (Van Leeuwen’s Comm. 117). Such also appears to have been the ancient rule of the Roman law (Dig. b. 43, tit. 12, law 12; Lalaure’s Traite Des Servit. Reeles, 47). I have no doubt, therefore, that this grant to the ancestor of the patroon would have been sufficient, by the laws of Holland, to have conveyed the right to the alveus, or bed of the middle sprout of the Mohawk, as an appurtenant to the grant of the manor and the royalties connected therewith, so far as relates to the right claimed of erecting a dam and using the waters for hydraulic purposes upon the adjacent lands, as it could not interfere [595] with any navigable communication. If we should decide that a conveyance bounded by waters not navigable for any purpose, only conveys the land to the shore, or margin of the river or brook on the borders ©f which the land lies, and that the bed of the stream still remains in the grantor unless it is expressly granted by name, we should disturb the title to nine-tenths of the mill sites in this state.
y Whether the English common law prevails in this state, in relation to the alveus or bed of navigable rivers above tide water, is a question not necessary to be decided in this cause. My opinion on this subject and the reasons for it are very fully stated in the report of the case when it was formerly before this court (5 Wendell, 443).' I need only say, that I have not as yet discovered any reason to change the opinion then expressed, that the rules of the common law on this subject were fully applicable to the colonies in their new situation here as they were in England. It was as necessary to have some fixed and settled rules as to the boundaries of property here, as it was in the mother country. By the principle of the common law, no right passed to the riparian owners, upon the borders of navigable streams of, fresh water, which it was then of/any material importance to the people at large to retain. The right of navigation, and to restrain the erection of any work in the bed of a navigable river which could impede the free passage of boats and rafts, was as fully secured by the common law of England as by the rules of the ancient Roman law ; which rules have generally been found sufficient to protect the rights of the public in relation to the large rivers of the continent of Europe. Indeed there was no essential difference between the civil and the common law in this respect, except that the former secured to the public the use of the banks of navigable streams as a towing path or passage. I presume no one will seriously contend that it would now be consistent with the acknowledged rights of the riparian owners even upon the banks of our largest rivers, or agreeable to the dictates of sound policy, to have such a principle established here. It would hardly have been adopted by the Romans, or by the .other nations of Europe in which it now prevails, except [596] from the necessity of the case; and before the more modern improvements to navigation had rendered the use of the banks for such purposes comparatively useless. In other respects, so far as the substantial rights of the public and of the riparian heritors were concerned, the civil law and the common law were the same. It is true, indeed, that by the civil law the alveus or bed of the stream did not pass to the owners upon its banks, whose heritages had the river as a natural boundary, while such bed was actually co/ered by the waters of the stream; but the moment the waters-dried up, or the course of the river was changed either wholly or in part, so *335 as to render its bed susceptible of a beneficial use, the civil law gave the land which had originally formed a part of its channel to the heritors upon its banks, to the same extent that the common law now gives it to the riparian owner, while it is covered by the water, without the power of using it in any manner inconsistent with the public right of navigation. By the settled rule of the civil law, if a river abandoned its former bed and formed a new one, or from any other cause ceased to flow in its old channel, the soil which was thus left permanently dry was no longer the property of the public; but it immediately became the private property of the owners of its former banks, the owners on each side taking to the centre of the'original channel of the river (Vattel’s Law of Nat. 122, § 270; Dig. B. 43, tit. 12, § 7; L. 7, § 6, de acquir. dom.; 1 Biret’s Applic. 218; 2 Ersk. Inst. tit. 1, §5, p. 196). And, as we have before seen, the islands in tl: river belonged to the riparian owners who had the river for their natural boundary. The civil law indeed made a distinction where the lands of the riparian owners were limited, that is, expressly confined to the original bank of the stream without the rights of increment. In this respect, however, I understand the rule of the English common law to be precisely the same; for there can not be a possible doubt that if I am the owner of lands on either or both sides of a stream, whether the same be navigable or otherwise, and am also the owner of the bed of the stream itself, I may convey the land on either side, or both, in such a manner as to retain or reserve to myself the bed of the river [597] or stream, and the islands therein if any such there should be. If, therefore, by the terms of my grant, it clearly appears that I intended to limit the grantee to the place where the present bank of the river is, and not to adopt the river itself as a natural boundary, neither the bed of the river, the islands therein, nor the right of increment, will pass to the grantee. But when the language of the grant is such that it can fairly be presumed I did not intend so to limit it, but to adopt the river itself as a natural boundary, then this common law principle will prevail and the rights of the grantee will extend to the thread of the stream; subject, however, to the rights of the people at large to the unrestrained use of the river for the purposes of navigation, if it is a navigable stream. And this is precisely the distinction which I understand the civil law writers to refer to when they speak of the lands of the riparian heritors being limited, and when they speak of them as being bounded upon the river as a natural boundary, with the right of increment or alluvion.'
Considered in this light, is there any possible objection to the common law rule, even in regard to our largest rivers which are wholly within this state and above tide water? A different rule must probably prevail as to our large navigable lakes, which are mere inland seas, although there is neither ebb or reflux of the tide; and also as to those lakes and streams which form the natural boundaries between us and a foreign nation. Lakes or standing water, although susceptible- of increase or decrease, were by the civil law always considered as limited in point of properly, and therefore the heritors on their borders were not entitled to the rights of increment (L. 12, de acquir. dom; Birefs Applic. 258). As tp national boundaries, Schmalz, in his law of nation says, when the territory of a nation includes within its boundaries either rivers or lakes, all other nations recognize such waters as making part of the territory of that nation, and do not contest with the sovereign the right of possession thereof within his dominions. If such waters, especially rivers, form the frontiers of different territories, without any fixed agreement by treaty respecting the same, or any settled rights by possession, the custom is established as nature seems to indicate, that the [598] respective jurisdictions of the bordering countries shall extend to the middle of the stream, and that the right of navigation is reciprocal on both sides of such j urisdictional line. The states thus bordering unon the stream *336 ma.y by treaty adopt as a boundary either the middle of the stream or the whole of the river; and, in case there is no stipulation on the subject to the contrary, if the river in the course of events should naturally take another direction, the middle of the primitive bod of the river would still continue to form the frontier of the territories, as the inhabitants of a country can not change their character of citizens by the mere change of the course of a river (Schmalz, Fr. ed. of 1823 by De Bohm 143; see also Valtel, 129, § 265, to 271). There are national reasons, therefore, which perhaps require that neither the common law right as to the extent of boundary, nor the civil law rule as to the right of increment, should be applied to a river which forms the boundary between neighboring nations, so as to give constructively to an individual any right in the bed of the stream, or to the islands therein situated, where the sovereign power of the territory from which such grant proceeds shall not have expressed his will explicitly as to the extent of such grant. In such a case certainly it would be highly improper to give a private heritor upon the banks of a navigable river, forming the national boundary, a right to the bed of the river, by implication merely, which might induce him to make erections that would perhaps interfere with the right of navigation or passage which ought to remain common to the subjects of both nations. This principle may perhaps account for the original adoption of the distinction found in the common law between the bed of the tide "waters, or arms of the sea, which were originally considered as the common highway of all nations, and therefore within the jurisdiction of the admiral, and the alveus or beds of other navigable waters, which in England were always considered as a part of the national property or as held of the crown by the feudal tenure, and as being exclusively within [599] the jurisdiction of England and subject to the national sovereignty alone. On this subject, however, it is unnecessary to express any definite opinion in this case.
The dilferent grants, by the legislature, of islands lying in the bed of navigable streams, although the lands upon the opposite banks had previously been granted, have been referred to as an evidence that the rule of the common law had never been adopted as the law of this state. No reliance, however, can be placed upon such acts of legislation; neither can we form any opinion as to what the legislature itself thought on the subject, without knowing the facts of each particular case, and what was stated in the petitions upon which such acts were founded. In many cases, undoubtedly, the persons to whom the islands already belonged by this rule of the common law, have applied for a legislative grant of the same, because their right was doubted. In many cases also the grants upon the borders of navigable streams have been so limited as to confine the patentees to the bank of the stream by the plain terms of the patent itself. Such is the case, as I understand the testimony of the late surveyor-general, in relation to all the grants for military bounty lands which lie upon the borders of navigable rivers. He says the patent itself only contains the number of the lot; but that the survey and field notes in his office contain a particular description of the boundaries. That where such lots are situated on the banks of navigable rivers, they are bounded on the banks of such rivers or streams, and run thence along the bank of such stream. This is a clear indication of the intention of the grantors that the patent should not include any part of the alveus of the stream or of the islands therein. It is therefore a limited grant, within the meaning of that term as used by writers on the civil law, and it can not be extended to the thread of the stream, or include any island therein, even on the common law principle, especially when we take into consideration the fact that by the public law of the state the patentee was only entitled to a certain number of acres. This, therefore disposes of all the *337 evidence as to the subsequent grants of islands in the navigable rivers adjacent to these lands. I presume, also, that if we had the particular facts before us, we should find that many of the other cases referred to, where the subsequent grant of islands is supposed to conflict with previous grants to the riparian owners upon the principles of the common law rule, could be explained in the same manner. It at least shows that in this particular case of the bounty lands, the commissioners of the land office, under whose- directions those patents were issued, not only understood the rule of the common law as existing here, but that the}- knew their own duty too well to make a description of the land in the usual form, by bounding it upon the river itself instead of the bank, which might have included islands in the river, and thus have given to the patentees more land than the law allowed. As this bounding of the lots upon the bank, instead of the river, was a departure from the ordinary form of describing lands bounding on a liver or stream of water, and appears to have been uniform in this case, there cari be no doubt that it was the result of deliberation; and that the surveyors must have been instructed to bound them in that manner in the description and field notes of the survey.
In relation to the patent which was given in evidence to the proprietors of Burnetsfield, on the Mohawk, although the descriptions therein are such as probably to give to the respective patentees the alveus or bed of the stream to the centre thereof, and of course the right to all future increment according to the rule of the common law. I think there is sufficient on the face of that grant itself to show that it was not the intention of the government to convey to them the small islands lying in the river, which were a few years afterwards patented to Peter Winne. It appears from the recitals in the patent, that certain German emigrants had, under a license from Governor Burnet, obtained an Indian title for a tract of land twenty-four miles in length, on both sides of the Mohawk, extending west from the Little Falls, and they thereafter applied to the Governor to obtain a patent for the same. That in consequence of the restrictions as to the grants of lands in the colony, contained in the commission to Governor Burnet, and pursuant to the instructions therein contained, the application w'as refer- [601] red to the council, who consented to a grant of one hundred acres of the tract to each man, woman and child of German palatines in whose behalf the petition was presented; that in consequence of this decision of the council, the governor¡ the receiver general and the surveyor general, the commissioners appointed for the purpose, set out the. land granted by the Indians, or a part thereof, into lots of one hundred acres, and which were then conveyed to the patentees in severalty; each lot being particularly described in the patent and granted to the individual by name. These descriptions all show that the land, to the extent of one hundred acres, lay on the borders of the Mohawk and West Canada creek; so that if any island in the river itself were included in the grant, the patentee would have had more land than the governor’s council had authorized to be granted. In one or two instances, also, some of the islands in the Mohawk are expressly added to the land upon the banks of the river, for the purpose of making up the full lot or quantity of one hundred acres; and that too of islands or parts of islands which lay opposite to lots in the same patent granted to others. Under these circumstances, whatever rule of law might have prevailed in relation to grants of land upon the banks of such a river, no one could rationally have supposed, from reading this patent with the recitals therein, that the islands in the river which were not included within the one hundred acres set out by actual survey for each patentee, were not intended to be excluded from the grant; and the subsequent patent to Winne for the islands not thus included was perfectly consistent with this prior patent, even if it *338 was known to the officers of the crown that any of the small islands granted to him lay opposite to the lots of the German settlers.
The necessary information is not contained in the case to enable me to understand whether the other conveyances given in evidence on the trial, which are supposed to conflict with previous grants upon the common law principle, do in fact so conflict. I lay entirely out of view the legislative acts relative to the mill of McIntyre and others in the north sprout [602] of the Mohawk, and to the compensation to Selden for the supposed destruction of his mill privileges on the west sprout, and the several other legislative acts of the same character. These acts of recent legislation are very little to be relied on for the purpose of proving what the common law of this state was one hundred and fifty years ago.- Indeed the whole of these legislative acts and supposed conflicting grants, which were introduced into the return of the defendants merely by way of argument, or for the purpose of informing the supreme court what the law of the state really was, were improper as evidence for the consideration of the jury, as in civil cases the jury are to decide matters of fact merely, and the court is the proper tribunal to inform the jury what is the law of the case by which they are to be governed in arriving at the conclusions of fact which are to be established by their verdict. Even the court, in deciding upon the law of a case, only refers "to historical facts, or other matters of such public notoriety as to be presumed within the knowledge of the intelligent portion of the community generally, as evidence of the general law of the state. Indeed it would present a new and striking instance of the glorious uncertainty of the law, if the legal construction of all our titles to real estate was to be settled by the verdict of a jury and upon such evidence of the law as has been produced by both parties in this case.
The finding of the jury as to the right of the relator to the south half of the middle sprout is sufficient to entitle him to a mandamus to assess his damages pro tanto. The answer that the defendants make to the claim for damages is that the relator has not sustained any damage because he has no title to the middle sprout. The issue therefore, is upon that allegation, and if he shows title to half as much as lie claims, he is entitled to damages to that extent only; but this is no reason why the appraisers should not allow him anything. If in their return to the mandamus the defendants had returned that the relator was only entitled to one half of the middle sprout and fall, and therefore was not entitled to the whole damages which he claimed, the,court would not have refused the mandamus to compel [603] the appraisers to allow him the damages he has sustained by the destruction of his right as to that half. The same must be the result when the same fact is ascertained by the verdict of a jury upon the traverse of the return.
I know of no rule of law or equity which can entitle a man to compensation for the destruction of a mill site or other hydraulic privilege after he has commenced building thereon, which would not entitle him to the same compensation, except so far as the value of the erection itself was concerned, if the mill site or water privilege was destroyed by the same means before he commenced his improvement of the same. The case cited from the Massachusetts reports on this subject, in which a distinction is taken between a mill site which has been improved and one that has not, evidently referred to the local statute authorizing property to be condemned for the use of a mill site on the stream below, and fixing upon a special mode of compensating the owner on the stream above. In -the Scottish courts it has frequently been decided that the natural course, or the situation of a stream can not be diverted or altered, even for the purpose of a mill, if the objector can show that he will sustain any real injurv thereby; such as an use, or an expecta *339 tion destroyed, or an amenity injured (Bell’s Law of Scotland, art. 1101; Ersk. Inst. tit. 9 § 13; Hamilton’s case, Mor. Dic. of Dec. 12826). .And the natural right of an individual to he protected in the future use of his property must certainly be the same in every part of the world. The idea that a private stream not navigable may be made navigable by artificial means without compensating those who may be injured thereby, is entirely repudiated by Lord Glenlee in the case of Macdonnell v. The Caledonia Canal Commissioners, to which I have before referred. He says, “We are quite acquainted with the difference between a public navigable river, even though never used as such, and a private river. Now if this was not previously a navigable lock, the operations of the defenders will not change its character, and the compensation for the total alteration of its character would be due.” In the case under consideration, the power of the state to improve any of its waters.so as to render them navigable, or to improve the [604] navigation of those which could before be navigated to a certain extent, is not denied by the relator, and indeed could not be: as the right to take private property for any public use, which the legislature, in the exercise of a sound discretion may deem expedient or necessary for the general good, is expressly recognized in the constitution itself. What the counsel for the relator have contended for in this case is, that whenever it is necessary to take the property of an individual, or to destroy or materially injure him in regard to its present or future use, for the public good, he is entitled to compensation for the damages which he may really sustain thereby. This is the fair and reasonable construction of the constitutional provision on this subject; and in this case I think the interest of the relator in the fall or mill site which has been destroyed as to any future beneficial use, by overflowing it by the waters of an artificial pond created for the benefit of the public, is a taking of his property fpr the use of the canal, within the meaning of the laws on that subject./ I think the judgment of the supreme court awarding a mandamus to the appraisers to proceed and ascertain his damages in the premises, was therefore correct and should be affirmed.
By Senator Beardsley.'"/When this cause came before this court in 1830, see 5 Wendell 423, the supreme court had adjudged that the whole of the middle sprout belonged to the defendant in error, and he was entitled to damages for the entire waterfall alleged to have been destroyed. This court remitted the proceedings to the supreme court, that a trial might be had with a view of ascertaining the actual location of the manor Rensselaerwyck, as well as of the extent of the interest of the defendant in error. The result of that trial shows that several islands in the Hudson river, including Green Island, have been held as part of the manor, and whether such practical location as justified by the terms of the grant, is now a matter of very little consequence. I still think that the letter of the grant does not extend to the islands or middle sprout; but as the actual location includes Green [605] Island, and the defendant in error shows that he holds it under the manor grant, the question must be considered as if there was a rightful holding of the island by the relator.
The supreme court place the relator’s right to damages simply on the ground that he is owner of Green Island, and as such has a right bv implication to go to the centre of the stream between that and Van Schaick’s Island, and thus is owner of one half of the sprout and waterfall, and entitled to damages for the destruction of that half. The claim for damages as the case now stands, is reduced 50 per cent, below the first judgment of the supreme court; and I can not perceive how is has been rightfully given to that extent upon the assumption that the common law doctrine, as declared by that court is to prevail. The evidence shows that before the erection of the dam in the Hudson river, the tide ebbed and flowed from the Hudson in *340 eight the middle sprout and raised the water about eight inches at the rift or waterfall. Now upon the principle assumed by the supreme court, the sprout from the Hudson to the fall was an arm of the sea, and navigable, (the tide ebbing and flowing,) and to that extent belonged to the public, and yet judgment for damages has been given, as well for this part as that further up the stream, and above the flow of the tide. It is very obvious, therefore, that if this part of the sprout is to be regarded as navigable from the flux and reflux of the tide, that the judgment is erroneous and might be reversed on this ground, as giving to the defendant damages for a greater interest than he is entitled to.
But it is not necessary to rest the decision on so narrow a basis. The case has been argued on more enlarged grounds; and before proceeding to consider the important question that have been urged by counsel, it may be proper to remark: that the question submitted is one of mere right between the parties. It is not a question whether as a matter of expediency or justice, the state will remunerate the relator, which might be a very proper subject for legislation, but whether he or the state owns that part of the bed [606] of the Mohawk. As a citizen of this state, and as a member of the legislature, I desire to see a most liberal spirit cherished in reference to the rights of citizens; and the success and popularity of our great system of internal improvements can not be maintained without a just regard to private rights. If individuals are to be borne down or their rights sacrificed or disregarded, we may soon expect to find our canal system rendered odious, and instead of being regarded as the pride and glory of the state, it will be deprecated as a system of atrocious tyranny and oppression. No strained constructions of the rights of the state should be indulged, except where the public interest imperiously demands it; nor should individuals whose lands adjoin navigable rivers or rivers where the public have an easement, or right of passage only, or even where the state owns the bed of the stream (if in any case it is such owner.) be vexed or disturbed by the sovereign authority, in the enjoyment of such rights and privileges in the 'water, as do not injure the public works, or prejudice to the public interest. Mills and hydraulic machinery are essential to the growth and prosperity of the country, nay to the existence of a dense population; and they are equally essential to the increase'of business on our canals, as greatly contributing to the amount of tonnage on which duties are to be charged. Where the im-. provement and enjoyment of these hydraulic privileges by individuals can be tolerated without injury to the public works, leaving a sufficient quantity of water for the public use, no obstruction should be thrown in the way of private enjoyment or individual enterprise. The moral sense of the community will revolt at any thing like vexatious interruptions, or illiberal attempts to enforce substrae! rights, particularly if of questionable existence, or not necessary for the support or preservation of the public works. The subject matter in controversy in the present suit is not one where an individual has made improvements. Were this the case, and those improvements were placed in a stream where the public had a right of way, (an easement,) or even where the bed of the stream was claimed by the state, and it should turn out rightfully claimed; yet if a citizen owning adjacent land should, under [607] a mistaken view of his legal rights, make valuable erections, and that too without objection from the state authorities, courts of equity would probably protect such person, and issue an injunction to restrain any interference on the part of the state without just compensation. This relief would probably be granted upon the same principle that courts of equity interfere between individuals, not suffering one to stand by and see valuable improvements made under mistake as to the rights of the party, and thus claim the benefit of such improvement. Certain it is that the legislature, in the liberal *341 spirit that has characterized its canal legislation, whatever courts might do, would protect and remunerate an individual thus situated. But that is not this case. Here has been no improvement, or even occupancy of the bed of the stream, or of the waters flowing over it, and if it belongs to the state, surely the. relator should not complain if the state occupies and uses it to accelerate our system of internal improvements. The dam that has caused the injury was placed in the Hudson river within tide waters, to improve the navigation of that river above; and the supreme court have adjudged the relator to be the owner of one half of the sprout on the ground ofbeing the occupant under claim of title of Green Island. The question therefore, is whether, as such owner of the island, he constructively owns the middle of the sprout. Perhaps a question might here be raised, whether the relator, by a practical location of the island under the manor grant, if such location be not supported by the terms of the grant, could’acquire an interest by occupancy as against the state beyond his actual possession; or in other words, whether upon any principle, without a grant of the island, he could by taking possession of it under claim of title, extend his right as riparian owner by construction, to the centre of the stream, when he has never had actual or even constructive possession except as owner of the adjacent land. I throw out this suggestion for consideration as possibly having a bearing upon the question, if it should be supposed that the grant did not in fact include the island, of which I have very great doubts—not intending, however, to base my opinion upon it.
Did the original grant of the manor of Rensselaerwyck and its sub- [608] sequent confirmation carry with it the sprout and waterfall which now form the subject of controversy? When this cause was formerly before this court, I came to the conclusion that neither the island or sprout were included within the grant. It appeared to me that as the patent lines were to extend northward up along both sides of said river to the Cahoes falls, that it did not include the bed of the river or the islands. And without having any proof at that time of the actual location of the manor under the grant, I supposed that as the Cahoes fall was a perminent, well defined and unchangeable monument, that the line must be run up the Hudson and then to the fall along the west bank of the Mohawk, which at the time of the grant and confirmation was supposed to be the Hudson river, and from, the fall to run west twenty-four miles. That the line from the south bounds of the manor on-the east side of the Hudson must run northerly along the side of the river as far north as the Cahoes, and then turn and run east twenty-four miles, leaving the tongue of land about Waterford and the islands between these two lines excluded from the manor grant. From evidence produced on the trial and now before us, it appears that such was the actual location of the patent, except that the tongue of land about Waterford, with some small islands down to and including Van Schaiek’s Island, were held under prior patents, and that Green Island and some other islands below it have been claimed and held under the manor grant. His honor, the chancellor, placed considerable stress on the words “ in and upon the banks,” as conveying the islands in the Hudson river, which I'supposed was equivalent to saying “ in the vicinity of or upon the Hudson river.” An extract from the patent of confirmation of Col. Dongan of 4th November, 1685, has been furnished, and which was confirmed by the patent of 20th May, 1704, from which it appears that the words in the first patent were “ on and upon the banks of the Hudson river,” &c., so that the word “ in” has probably been substituted for “ on,” and if so, still leaves the true construction as before, a matter of [609] doubt so far as that clause is to govern.
The original Dutch grant being under the civil law, which prevailed in Holland, and which, if brought to this state by the Dutch, its first settlers, did not under that law convey even the fresh water rivers; because it is a *342 well established principle of the civil law, that grants bounded on rivers salt or fresh, do not carry the bed of the stream; but at common law they do, where the tide does not flow and re-flow. It was therefore urged by the counsel on behalf of the people, and there seemed to me to be much weight in the argument, that as the Dutch grant under the civil law carried the grantee only to the edge of the stream, (if it be conceded that Green island rightfully passed under the terms of the grant,) so the patents of confirmation in 1685 and 1704, only confirmed to him the property that had previously been granted, and to no greater extent. Might it not with the same propriety be urged by the defendant in error, that the patent of confirmation extended the east and west lines beyond the twenty-four miles, as that it extended the north line to the centre of the stream, beyond where it was established by the original grant? But there are other objections to the claim for damages.
The evidence establishes the fact most conclusively, that not only the colonial government but the state authorities have considered the bed of the Mohawk as belonging to the public and not to individuals, or that the common law principle, that the owner of the adjacent land is entitled to the bed of the river, has not been considered as applicable to the Mohawk. Take for instance the great number of grants of farms on the Mohawk made in 1725, bounded on the river as follows, “Thence down along the said river, &c.” Under the rules of the common law, these grants would have extended to the thread of the stream, and would have included the islands, and yet the islands from Little Falls to Canada creek are held by separate patents issued after the farms were granted. -So, again, an act was passed 30th of March, 1792 (2 Laws 427, Greenl. ed.), by which two compa[610] nies were incorporated, the one known as the Western Inland Lock Navigation Company, and the other as the Northern Inland Lock Navigation Company;—the former to improve the navigation by locks and canals from the navigable part of the Hudson river to Rome, and thence to Lake Ontario and Seneca Lake; the other to open a like communication from the navigable part of the Hudson to Lake Champlain. This act was amended 22d December, 1792, and the legislation on the subject seems very conclusive on the question of ownership of the beds of the Mohawk and Hudson. By the 5th section, it will be perceived that the lands under the water of the Mohawk, which may be occupied by the corporation, is vested in it during its continuance “as a free gift from the people of this state; saving and reserving to the people of this state the right to all lands under the water not so occupied as aforesaid, to be appropriated as the legislature shall from time to time direct.” And there was a like grant of the lands under the Hudson river with the like saving and reservation. This bill was objected to by the council of revision on account of the provisions of the third section, and and was returned to the legislature. The members of the council of revision who passed upon the bill, were governor George Clinton, Chancellor Livingston, Justice Hobart and Justice Lansing, and the objection was, that the third section was a violation of private rights, in improperly appropriating the lands of individuals and in not providing adequate compensation: but no objection was made to the fifth section. Notwithstanding these objections, the bill was passed by a unanimous vote in the senate save one, and by an almost unanimous vote in the assembly. Here it is evident that the bill underwent a most rigid scrutiny, not only in the council of revision, but in each branch of the legislature, and yet no one objected to it as violating private rights in granting such parts of the beds of the Mohawk and Hudson as were necessary, and in asserting the right of the state to the residue. On looking at the names of those who then composed the council of revision, and of those who composed the legislature, it will be found that many *343 of our most distinguished citizens and soundest' lawyers were among them; men who not only knew the law, but who would be the last to violate it or to sport with private rights, and the present estimable proprietor of the manor, under whom the relator claims title, was one of the members of the senate who passed upon this question and asserted the ownership of the state to the bed of the river. In reference to this legislation, it is worthy of remark, that here was brought to hear the scrutiny and solemn deliberation of the three great branches of the government, the executive, judicial and legislative upon the precise point of ownership of the bed of the two rivers, and it resulted in the declaration of ownership in the state. This was almost half a century ago, and before the relator acquired his title, and one object of the Northern Company as expressed in the act of incorporation, was to complete the navigation of the Hudson river, opposite the house of George Tibbets in the town of Troy. If I may be allowed to digress from the subject under consideration to one on which the legislature divided at the last session, and which has been the subject of much discussion, (and I may say of animated discussion too.) in reference to the loan of the credit of the state to the New York and Erie Rail Road, sometimes denounced as unconstitutional, at other times as impolitic, unjust and unequal. It may be remarked that by referring to the act of incorporation of the two inland lock navigation companies, a precedent will he found recognizing the principle on which the state loaned its credit at the last session; for in this act of incorporation, the state was to give §12,500 “as a free gift to each company whenever they had respectively spent §25,000.” And in addition to this gift in cash, it subsequently gave the beds of the rivers to the corporations. This was the commencement of our internal improvements, and from this humble beginning we may trace the splendid results that now shed such lustre on the state of New York. But to return; it appears to me that if the legislature had passed a declaratory law enacting that the bed of the Mohawk was the property of the state, and that such was and had been the settled law of the land, that it would not have been a much more solemn declaration or more binding on the judicial tribunals than the legislation under consideration. Chief Justice Spencer, in [612] Hooker v. Cummings (20 Johns. R, 100), uses the following language: “Now I do not feel authorized to reject the principles of the English common law, by saying they are not suited to our condition, when I can find no trace of any judicial decision to that effect, nor any legislative declaration or provision leading to such a conclusion.” Would the learned judge have made this remark, had he not overlooked the legislation and the various acts of the government and its agents that have been proved on this trial? And could he with propriety have made it in reference to the Mohawk? I feel a strong conviction that the bed of that river, at least, whatever may be said of others, is still the property of the state; and this conviction is strengthened from the other acts of legislation in reference to this river, which were proved on the trial, and relied upon on the argument, particularly in relation to granting water privileges by the state below the Cahoes falls.
When this cause was here on a former occasion, it was urged, as it has been now, that the common law of England, in reference to rivers, had never been adopted in this state. That question I examined, and came to the conclusion “that where.patents have been bounded on navigable fresh water rivers in this state, and nothing appears from the grant that the state intended to part with the bed of the river, the patentee shall not by an implied grant take the river to the exclusion of the state, where the state wishes to use it for public purposes.” This .was not the point on which the cause turned; nor did I deem it necessary to the decision of the cause to discuss *344 it, though I did do so, it having been argued with great ability by the counsel on each side. Nor did I consider it a turning point in the cause at present, enough having been shown in reference to the Mohawk, at least, to . overturn this claim for damages. If this cause was narrowed down to the | question, whether the common law had ever been adopted in this state in | reference to navigable fresh water rivers, there might be a doubt whether I this sprout, if not navigable, and which is not the main channel of l[613] the Mohawk, would be governed by the same rule that would apply to the river itself. It is one of the mouths by which the Mohawk discharges itself into the Hudson, and a principal one too, and I suppose must be subject to the same rule that governs in reference to the river and other sprouts, though I must confess I have not examined this question. Suppose the water fall had been destroyed by the Western Lock Navigation Company by throwing a dam across the sprout where it leaves the western channel, with a view of confining all the water, and thus rendering the navigation more perfect than before, would the state be subjected to damages for having authorized the company to do so, or the company for exercising their corporate rights? It seems to me that no damages could have been recovered for the bed of the stream. In expressing the opinion when this cause was here before, that the common law had never been adopted as applicable to our large fresh water rivers, I was not unmindful of the fact, that a contrary opinion had been held by the judicial authorities of this state. Nor did I adopt it without great diffidence of opinion and distrust of my own judgment, and I ought to say without doubts, too, whether it was not incorrect. Not being a turning point in the cause, I did not intend to put forward that opinion as an authority, (even on my own part;) and I should feel at liberty now to depart from, and even to repudiate it, could I be satisfied that it is wrong. Nor do I now, in any further remarks that I may make upon that subject, intend to express an opinion that shall be considered binding in reference to other rivers, where grants have been made by the government, particularly since the revolution, because those questions can not perhaps legitimately arise in this cause. I have my impressions on this subject, which may with propriety be stated, particularly after the learned and elaborate discussion by the respective counsel; but I hold myself uncommitted, should other causes arise in reference to other rivers. It may be proper to remark, that I do not intend to call in question the decision of the supreme court in reference to the case of Jennings (6 Cowen 518). That part [614] of the Chittenango creek was not navigable, in any sense of the term; and the question was not raised, nor was it put on that ground. The question was whether a grant of land on the margin of a stream carried the grantee to the centre, and the court held that it did. No good reason in my judgment, can be urged in favor of a different rule of law in reference to small streams like the Chittenango; but in respect to navigable rivers, whether fresh or salt, there may be great propriety in the application of the rule, and particularly where the state is a party, and uses the water or bed of the stream for public purposes. The reason why courts in other states have rejected the common law rule, in reference to large navigable rivers above tide water is, that it is not fitted or applicable to such rivers; but I am not aware that it has been decided in any of the state courts, that a grant or deed, where the premises are bounded on a mere creek, do not carry the party to the centre of the stream. In the South Carolina case relied upon by the plaintiffs in error (1 M’Cord, 580), where the court held the common law not applicable to navigable rivers above tide, it was expressly decided that a deed bounded on a stream not navigable carried the owner to the thread of the stream; and it seems to me preposterous to suppose, that the state intended to reserve, or that purchasers ever consented to purchase on *345 the margin of creeks, without having a share of the water, unless otherwise expressed in "the grant. I think, therefore, that Jennings was entitled to his damages, not only as owner of the stream, but as having made valuable improvements long before the state asserted a right, and without objection from the state authorities; that it would have been not only a violation of private right but of justice, to have destroyed the value of his property without compensation, even though he had not owned the stream.
On looking over the proof given by the plaintiffs in error in this cause, it struck me that the testimony of the late surveyor general, in reference to the survey of the military lots, might be urged as an argument in favor of the opinion of the supreme court, in regard to the common law principle, as applicable to our navigable fresh water rivers. It appears that those surveys were so made that lots, situated on navigable rivers, [615] “are bounded on the banks of such rivers and run thence along the bank,” Sec., and that afterwards the islands in the rivers were granted by separate patents. In Hatch v. Dwight & Burnell (17 Mass. Rep. 298), it is held that where lands are bounded on the bank of a stream or river, and not on the river itself, that the stream is excluded. This position is controverted by Mr. Co wen, in his learned and valuable note to Jenning's case (6 Coleen Rep. 549), but seems to have been relied upon as sound law by the counsel for the plaintiffs in error in this cause when it was here before (See 5 Wendell's Rep. 429). It is not necessary now to decide this question; but if a deed bounded upon the bank of a river does not convey any part of the stream, then the bounding of military lots on the banks may have been (or at least it may be so urged) from an impression on the part of the state authorities, that the common law prevailed in reference to such rivers, and that they with the islands would pass to the patentees, if Dounded on the streams instead of the banks, and they may have bounded the lots on the banks to prevent the rivers and islands from passing. I am, however, rather of opinion that the bounding on the bank is equivalent to bounding upon the stream, and that Mr. Co wen is right in not recognizing the distinction in 17 Mass. Rep. as sustained by law. He is strengthened in his views from one of the New England cases referred to on the argument, where it was held that a grant bounded by a tree standing on the bank of a river, and extending up or down the river to another tree and then extending back, that such a grant, although bounded by trees on the bank, by implication extended to and embraced an island lying some half a mile from the bank, thus in effect transferring the trees growing on the bank almost half a mile to the thread of the stream. If the bounding of grants upon the banks is equivalent to bounding on the streams, then the granting of the islands after the military lands were granted on the banks of navigable rivers, is another act of the government in favor of the principle that the common law is not applicable to such rivers; for why issue separate patents for the islands, if they had already passed by the previous grant to the owner [616] of lands bounded on the rivers?
Here allow me to inquire, what good reason can be urged in favor of ap-1 plying these printiiples to our large American rivers, and thus keeping up at distinction in name, where in reason and good sense none should exist. Why,' for instance, should proprietors of land on the Mississippi, where the tide ebbs and flows, be restricted to the bank of the river, and that part be called navigable only; and those proprietors of lands immediately above the flow of tide, be suffered to go to the centre of- the stream, when the river in ?oint of fact is actually navigable for thousands of miles above tide water. et such are the absurdities of the common law when applied to our large rivers. In England this rule is very proper in reference to their small riv- J ers, and is calculated to prevent litigation, by assigning to each definitej *346 owners. Bat in respect to our large rivers, there does not appear to be any propriety in the rule; and if in England and in this country it is essential to the public interest to declare that arms of the sea, bays and rivers, where the tide flows, belong to the state or nation, it is equally important that the same rule should prevail in respect to our large rivers where the tide does not flow. The learned counsel (Mr. Van Vechten) in his former argument (5 Wendell, 441), has the following correct remarks: “The counsel for the plaintiffs in error, err in assuming that if the common law doctrine, maintained by the supreme court, in the case Ex parte Jennings, prevails here, it must "unavoidably extend to our large rivers and lakes. Such is by no means a necessary result, nor has it ever been so considered by our government. The principle is not new that courts in the application of general legal doc-ti-ines have the power to modify the rule in its application according to the peculiar circumstances of the case; and this principle has frequently been acted upon by the constituted authorities of the state, in relation to its large rivers and lakes.’’ Blackstone, in his commentaries, 1 vol. p. 107, says: “It hath been held that if an uninhabited country be discovered and planted by English subjects, all the English laws then in being, which are the [617] birth right of every subject, are immediately there in force; but this must be understood, with very many and very great restrictions. Such colonists carry with them only so much of the English law as is applicable to their new situation and the condition of an infant colony. What shall be admitted and what rejected; at what times, and under what restrictions, must be decided in the first instance by their own provincial judicature. But in conquered or ceded countries that have laws of their own, the king may indeed alter and change those laws; but till he does actually change them, the ancient laws of the country remain.”
/■Now, if the colony'of New York is to be regarded as a conquered colony, and that the Dutch laws were in force at the time of the conquest, they would remain in force till altered by the English or colonial government, and the civil law having been introduced by the Dutch, it would be incumbent for those who hold that the common law had been introduced to show it affirmatively. In point of fact, it was conquered, though it was claimed by the English as belonging to them in right of discovery, and it is by the latter right that it is usually regarded. The Dutch, however, denied this right, as may be seen by Governor Stuyvesant’s letter (1 Smith’s History of New York, p. 19, 20, &c.). See also Sir John Randolph’s letter, where he speaks of New York as acquired by conquest (id. 314; and 1 Cowper 211). Bur if on the other hand it is to be regarded as having been claimed by the British government in right of discovery instead of conquest, (and so it' has been claimed and held in that country and in this,) then the British subjects brought with them only such parts of the common law as were applicable to their situation; and courts of law may determine what parts are applicable. In accordance with these principles, Smith, in his History of New York, 371, 2, says, “Part of the common .law was adopted and part rejected, and the colonial courts exercised a sovereign authority in determining what part of the common law was to be adopted.” See also 1 Story’s Comm, on the Const. 133. If that power belonged to the colonial courts, surely it [618] will not be denied to the courts since New York has become a sovereign and independent state; nor can it be denied, for we Icndw that our courts have frequently rejected principles of the common law inapplicable to our condition. Thus, in opposition to the common law, they have determined that a woman may be endoioed in wild uncultivated lands. So too. in regard to a tenant by the courtesy, that the owner of wild land draws to him the possession so far as to enable him to maintain trespass, which by the common law he could not without an actual possession; so a defendant *347 in a writ of right in England must have had actual seizin, yet with us seizin in law is sufficient.*! “
In South Carolina the common law has been rejected as inapplicable to their navigable rivers above tide water; (1 M’Cord’s R. 580). Justice Nott, in delivering the opinion of the court, says: “In England, it appears that by the rules of the common law,no river is considered navigable, except where the tide ebbs and flows; but that rule will not do in this state where our rivers are navigable several hundred miles above the flowing of the tide.” The courts in Pennsylvania have rejected the common law rule in reference to the Susquehanna, Schuylkill, and other large rivers (2 Binney, 475; 14 Serg, & Rawle, 71). Chief Justice Tilghman, in Carson v. Blazer (2 Binney, 477), says: “The common law principle concerning rivers, even if extended to America, would not apply to such a river as the Susquehanna, which is a mile wide, and runs several hundred miles through a rich country, and which is navigable and is actually navigated by large boats. If such a river had existed in England, no such law ivould ever have been applied to it. And Justice Yeates, in the same case, says (p. 484), “The uniform idea has ever been, that only such parts of the common law as were applicable to our local situation have been received in this government.” “The qualities of fresh or salt water can not, amongst us, determine whether a river shall be deemed navigable or not. Neither can the flux or reflux of the tides ascertain its character.” Chief Justice Parker, in 4 Pickering, 272, says: “There appears to be an important difference between the common [619] and the civil law in regard to the rights of the public and individuals on this subject. By the former, it would seem that the right of the king or the public is limited to those places whether bays, &c. in which the tide ebbs and flows: this being the definition' of navigable waters; whereas by the civil law all rivers properly so called, even above tide, provided they are navigable, belong to the public; aud so is the French law".” Code Napoleon. He supposes that this distinction arose from the difference in size between the rivers on the continent of Europe, and those in Great Britain; and he also supposes that the common law rule may be found very inconvenient in its application to many of the magnificent rivers in the United States, ■which are navigable much above the flux of the tide, especially by the aid of steam power. If this be so (and who can doubt it) then the common law is inapplicable, to our condition in reference to navigable rivers, and it is the right and duty of courts so to pronounce it.
I am aware that the courts in Massachusetts, Connecticut, New Hampshire New Jersey, Virginia and Ohio, as well as in New York, have adopted the common law rule in controversies between individuals. But as between the state where rivers are wanted for public improvement, the rule may be considered different; and I am by no means certain that had those questions arisen, as this does between the state and individuals, that different decisions would not have followed in the other states. We have evidence in this cause from the various acts of legislation and the acts of other departments of the government, and almost of every department, of strong indications of the legislative will, as well as uniform constructions of the state authorities on this question. It is evident that the acts of the government in reference to almost all the rivers in the state have been upon the assumption that the state had not parted with them, or that the common law was not applicable to them. In the Niagara river, at Black Bock, the state has not only erected a dam for the supply of the canal with water, but has actually leased the water privileges which belonged to the owners of the soil, if the common law is applicable to that noble river; and to be consistent with [620] previous decisions, I suppose the supreme court would feel constrained to decide, that an action would lie by the owners of the adjoining land against *348 an angler, who should be so fortunate, or rather so unfortunate, as to catch a rock bass in that river. I have already enlarged too much on this question having formerly expressed my views upon it in the 'reported case in 5 Wendell. These various acts of the government, in reference to rivers, afford a strong presumption that the common law has not been adopted to the extent contended for on the part of the relator. But in reference to the Mohawk, the evidence is very clear that that river and its bed belongs to the state, and that the unoccupied parts may be used for the purpose of improving our canals without paying damages to the owners of the adjoining shores. Without reference, therefore, to other rivers, and the law that may be deemed applicable to them, I feel constrained to differ with the learned judges of the supreme court, and must vote to reverse the judgment which they have rendered.
-•'By Senator Tracy. Being compelled to vote for reversing the judgment of the supreme court, and in the face too of the able and very learned opinion which the chancellor has just delivered in support of it, I feel that it is necessary to make some explanation of the grounds upon which my decision rests. The circumstances- in which I attempt this explanation will naturally make it brief and imperfect.
Whether the patent of Rensselaerwyck, under which the relator claims title to the south half of the middle sprout of the Mohawk river, is subject in its construction to the rules of the civil law, as they existed in Holland, at the time of the grant; or to the rules of the English common law, is a question to which I attach so little importance, notwithstanding the learning and ability with which it has been discussed, that for the purposes of this case I think it might be safety conceded that the relator should have the full benefit of either, so far as he can show their application to the subject [621] in controversy. Indeed, I am disposed to admit that the principles of the two laws, applicable to the questions arising in the case, will not be found materially opposed. But while I would make this concession, and even go so far as to admit that the relator has established a claim for damages, if we 'assume that the principles of either law apply, jvithout modification, to all the rivers of this state equally as to the streams of the respective countries where those laws have their origin, it is impossible for me to believe it reasonable or right that the great fresh water streams of this country ever were or should be subject to those narrow principles of individual appropriation which might fitly enough apply to the comparatively insignificant water courses which are found in England and even in that part of the European continent where the civil law originated.
.[i am aware of the difficulty of establishing this position by authority, and of the danger of setting up one’s own opinion judicially, on a particular subject, however peculiar and unique that subject may be, in opposition to general rules, that are established on subjects in many respects analogous; but still the great proposition, that “ fresh rivers, of what kind soever, do of common right belong to the owners of the soil adjacent,” when sought to he applied to all the great rivers of this country, is so opposed to our sense of all that is reasonable, right or true, that the stoutest advocates of riparian ownership usque Jilum aqua, are compelled to recede, and acknowledge that there are some exceptions to it. The chancellor, for instance, in this same controversy (5 Wendell, 447), admits, that in respect to some rivers and lakes “ our own local law appears to have assigned the shores, down to the ordinary low water mark, to the riparian owners, and the beds of the rivers and lakes, with the islands therein, to the public.” That there is a local taw in this country, not resulting from express legislative enactment, but growing out of circumstances peculiar to the natural state of the country and to the extraordinary condition of its first settlers, and which local law *349 is in derogation of or in opposition to the maxims of the civil laiv and the common law, seems to me to admit of no doubt.
In a general sense it may be true, that the discoverers and first settlers [622] of a new country are to be supposed to transplant and establish in it the laws and customs of their their fatherland; but this supposition reaches only such laws and customs as are adopted lo their new condition—at any • rate, can not be extended to those which are entirely inconsistent with it. Both reason and history instruct us, that this was the fact in respect to the first settlement of the country now constituting the north eastern part of the United States. Few of these settlements were made directly by the government of the counti-yof which the settlers were natives. Many of the colonies had their origin in mere private adventure, and others were founded in the sole design of providing an asylum and retreat from the laws of the mother country. In some of them, though of English origin and in some sense dependant on the English crown, many important principles of the common law, in regard both to civil and criminal jurisprudence, were never recognized ^'or supposed to be in force. In the very infancy of these establishments they provided wholly for their own government, and from the beginning disclaimed any subjection to the rules of the common law ^further than those niles might be found adapted to their peculiar circumstances and condition. In 1 view of these undoubted facts, it is utterly incredible, that when they j surveyed the magnificent rivers which a bountiful Providence had provided, ' as if for the very purpose of uniting, by the strong bands of commercial intercourse, their wide-spread possessions, that they could imagine that gifts which from their nature and extent, were capable not only of being enjoyed by all, but of supplying the wants of all, should, by a misapplication of a principle utterly unsuited to the subject to which it was applied, be made * the exclusive property of a few; in short, that" because the common law had assigned the ownership of a petty streamlet in England to its riparian proprietors, that therefore, unlooked for by themselves, the first settlers on the banks of the magnificent rivers of this country had acquired an exclusive title to the broad channels through which those rivers flowed. That the mere condition.of rivers being fresh and not subject to the flow and re-flaw of the tide, does not of itself determine that the alveus-or bed of [623] them belongs to the riparian possessors, has to be admitted in respect to many rivers in this country, and to some in this state. The rivers Niagara and St. Lawrence, for instance, are acknowledgedly public rivers, in every sense, as much as if they were arms of the sea into which the tide flowed. The,'reasons of the rule laid down by Lord Hale, when weighed against the considerations which it seems to me should determine a rule for this country, are as dissimilar and disproportionate as the rills of an island when contrasted with the expanded lakes and magnificent rivers of a continent. The long continued practice too, in this state, of granting islands subsequent to patents covering the opposite shores, is, to say the least of it, strongly contradictory of the assumed application of the common law rule of riparian ownership to the great rivers of this state; and certainly there is not found, either in the early records of our legislation or of the land office, any proof of the recognition of this rule. Ought we then, in the face of this long continued practice, and unconstrained by any direct authority, either legislative or judicial, to close our eyes to the condition of things that surround us—the expanse of this continent—the copiousness of its waters— the improvements, intelligence and wants of this age? On such a subject as this, even admitting the facts to be obscure or equivocal, and the law to be unsettled, is it wise for us to disregard the dictates of enlightened reason, the suggestions of public policy, and the irresistible progression of liberal principles resulting from the physical and intellectual advancement of man *350 kind, and turning backwards, to resort to the circumscribed views of a less enlightened age, for a narrow, insular and inadequate rule by which to measure the flow of our jurisprudence.'
Holding it, therefore, to be established that the principle that “ fresh rivers of what kind soever, do of common right belong to the owners of the soil adjacent,” is not, in its strict common law sense of universal application in this state, the question presents itself, what rule shall be found for discriminating those of our rivers which are, from those which are not [624] subject to this principle. Plainly this rule is to be sought in circumstances arising out of the nature and history of each river, for it is only by knowledge of the public use to which a particular water course has been or can be put, that it is possible in the absence of positive legislative declaration to determine, that it is or is not subject to the local law of this country. When we come to apply these tests to the river Mohawk, there will be found, I apprehend, no little difficulty in establishing a satisfactory and obvious distinction between it and the rivers Niagara and St. Lawrence, founded on those circumstances which determine the two latter rivers to belong wholly to the public. The early history of the country shows, and indeed the present case admits the fact to be, that the Mohawk has been always used for purposes of navigation and regarded as a public highway This doubtless was the case centuries before it witnessed the presence of civilized man. The first European discoverers found it in the use of the native Indians as a public highway, and to this use it had been devoted by them and their descendants uninterruptedly, to the present time. Except in the less volume of water that flow's through its channel, there- is not, that I am aware of any circumstance to distinguish it from either of the streams which have been admitted to be wholly public. In its falls, w'hich intercept a continuous navigation, it resembles both. If, therefore, it became necessary in this case to decide that the crown did not, and could not, by its patent of Rensselaerwyck, grant and convey an individual and exclusive ownership of the alveus or bed of the river to the patentee, I should be inclined to that conclusion.
But it is not, I think, necessary to establish this position; for if it be admitted that the patent of Rensselaerwyck did cover the bed of the river and convey it to the original patentee, or, in other words, that the river is subject to the common law, and attached to the ow'ners of the soil adjacent, yet I can not doubt that the right of the riparian owner to the use of the water flowing through the channels of a river, whatever that right is, is subordinate to the public right to the use of that element for public [625] purposes. The common law, anxious as it often seems to be. to assign exclusive proprietorship to everything susceptible of it. recognn zes the principle that “fresh rivers as well as salt nmyBe*Tlrldél’"Tvvo servitudes or affected with them: namely one of prerogative belonging to the) king, and another of public interest belonging to the people in general.” To' this latter servitude, from which the king can no more relieve it than any individual, this river certainly is an eminent subject. I understand the Chancellor as now agreeing with me that by the principle of the common law, no right passed to the riparian owners upon the borders of navigable streams of fresh water, which it was then of any material importance to the people at large to retain; and that the right of navigation and the right to restrain the erection of any work which could impede the free passage of boats and crafts are fully secured by the common law. The extent of this servitude of the public interest, it is necessarily difficult to determine by fixed rules for general application, for it must depend upon circumstances peculiar to each particular case. To ascertain its extent and character in regard to the Mohawk at the locality where this controversy arises, we must *351 bear in mind that up to the water fall, for the injury of which damages are sought in this case, the waters of the river are commingled with the waters of the Hudson; that the whole river, except at some points where navigation is interrupted by falls, has been always dedicated to public use as a water highway; that this was a dedication anterior to any European claim to the country, and when individual and exclusive proprietorship even to the banks or shores of the stream was unthought of and unknown—when the dark forests which overshadowed the river, equally with the river itself, were possessed and enjoyed in strict accordance with the great dictate of natural law, that nothing should be made exclusive property which can be conveniently enjoyed in common. When, therefore, it is sought to attach to this river the narrow and selfish principle of the common law which appends its alveus, or bed to the owners of its banks, neither reason nor justice induces the presumption that the riparians acquired thereby any [626] rights to the water flowing by their lands, which were inconsistent with, or not in every respect subordinate to the previously absolute and unqualified rights of the public to use this water in furtherance of the purposes to which it was primarily dedicated.
Admitting that the relator by virtue of being the riparian owner of the middle sprout of the Mohawk, had a right to avail himself of the element) flowing through it for all the purposes to which a water power can be ap-i plied, yet I deny that this right, however valuable under some circumstances! it might prove, was not wholly in subordination to the prior and greater! right of the public to the use of it for objects to which it had been previously and immemorial]}' dedicated. To illustrate my idea: the relator for the purpose of propelling machinery or otherwise, had no such right to the water that he might exhaust it to an extent that would diminish the usefulness of it to the public for purposes of navigation; while on the other hand I contend that the public had a right in it for this purpose which was utterly unembarrassed by the relator’s right to it for other purposes, as much so as though that right did not exist at all. Thus I can not doubt if the navigation of the river above or below this fall could have had the effect to exhaust the element or to destroy its usefulness as an agent for propelling machinery, that the relator would have no ground for complaint, because his right to use the water is merely incidental and contingent. Indeed I consider it imma-1 terial for the decision of this case whether the relator be deemed to possess 1 a technical title to the bed of the river adjacent to his land or not, for his right to the use of the water flowing over the river bed would be the same I in the one case as the other. If the relator’s lands were on the banks of the I Hudson below tide water, instead of the banks of the Mohawk, he would f undoubtedly as a riparian owner, be entitled to make every use he could of the water which did not interfere with the public use of it for navigation. I It has never been disputed that individuals who own the banks adjoining a I public river, even though it be an arm of the sea, may use the waters fori their own emolument, so far as it can be done without material in- 1 terruption to the public use. We have before seen that the servitude [627]j of public interest which may affect a river is not determinable by the 1 fact of the river being fresh or salt, or subject or not subject to the flow and reflow of the tide. Lord Mansfield in the Mayor of Lynn v. Turnir (Cowp. 86), rejects an attempted distinction between streams which were and streams which were not affected by the tide, in respect to the character of the servitude they were under. And Chief Justice Spencer, in Hooker v. Cumming (20 Johns. R. 101), concurs in the doctrine that all rivers in fact navigable, whether above the flow of the sea, or whether unaffected by the tide in their whole extent, are in regard to their use, public rivers, and subservient to the public use and accommodation, and subject to regulation by the legislature. *352 Whether water is fresh or salt, wherever it exists in sufficient volume, it subserves equally well all the purposes of navigation; and when it is considered that the internal trade of every civilized community is both in amount and importance vastly superior to all its external commerce, I am constrained to the conclusion that the intercommunication of its citizens by fresh water rivers and lakes, should be as sedulously protected against the claims and encroachments of private appropriation, as the great highway of nations. It may be that the property in the channel of a river, navigable, but not affected by the flow of the tide, which the common law technically attaches to the owner of the lands adjacent,gives to him rights in the water which do not attach to the riparian owners of lands flowed by the sea; perhaps the exclusive right of fishing may be one, and the right to increment another; and as between the riparians and private persons there may be others. But I must insist that between the riparian owners, of rivers immemorially used for navigation, and the public, there can be no difference, as respects the right of the public to command and control the use of the water for purposes of navigation, whether these rivers are or are not subject to the flow of the tide; in other words, the public has the same right to use and control the waters of the Mohawk, as those of the Hudson, for general purposes of navigation.
By the general sense of mankind, the use and control of rivers that are subservient to commerce has been considered a thing of common right, while from the nature of .the element, individual property in the water flowing in such rivers must be regarded as transcient, usufructuary and subordinate. Water like the atmosphere is subject to laws of mobility which forbid its individual appropriation. Like the air, specified portions of it can neither be identified by metes and boundaries, nor permanently retained in possession for any purpose of utility. If the erection and propulsion of a wind mill should render the air in its vicinity, materially less salubrious for the common purposes of respiration, it would be liable to be abated as a nuisance; nor can I perceive in the nature of things any difference in principle, where individual interference obstructs the' public use of water which is needed for the common purposes of navigation. Individuals may apply currents of air, or streams of water, to mechanical, manufacturing or other private purposes; but this should always be in strict subordination to the public use, and in every controversy of this kind between an individual and the public, instead of resorting Lo the common law notion of absolute riparian ownership in the element usque jilum aqua, it strikes me forcibly that the great principle of natural justice would be better subserved by an opposite course, founded in the presumption that' the rights to the use of air or water, the common participancy of which is beneficial to all, have never been surrendered to the few. We should seek to avoid and not to incur the reproach, quod natura remiltit, invida jura negará.
The injury complained of in this case, results from a dam in the Hudson river below tide water, erected by the state for the sole purpose of improving the public navigation. The complaint is, that it affects the condition of the water in the Mohawk adjacent the lands of the relator, so as to make the use of that water for his purpose less advantageous than it was before. The question is, has the relator such a property in this'water, that he can compel the state to indemnify him for a change in its condition which has made it less valuable to him for hydraulic purposes, at the same time [629] that it has been made more useful to the public for the purposes of navigation. This is not the question whether it may not comport with a liberal and wise policy, for the public to compensate an individual, who is unequally injured by the result of measures prosecuted for the eom *353 mon good; but whether there is such a defined legal claim for compensation that courts of law can be called on to enforce it. If the relator has the same title and rights to the water flowing by his island, as he has to the island itself, he doubtless has the same claim to be indemnified against whatever injuriously affects the condition of the one or the other. But 1 can not conceive the nature of his property in the two to be alike, or that the right of the public to elevate the water within its natural channel is not different from the right to elevate it above its natural channel, and thereby make it overflow and affect injuriously the property of individuals, to which the public has no pretension of claim for any purpose whatever. If the effect of the efforts now making by the general government, to remove the obstructions to navigation in the Hudson river, shall be to deepen the water at some places on the shore, and to lessen its present depth in others, I can not believe that a claim of the riparian owners for damages would be tolerated, even though they should show, as in many instances doubtless they might, that this change in the condition of the water had affected injuriously their use of the river. We may also take the case of the tide mills on Long Island, where the owners of the lands on the inlets of the sea, possess an undoubted right to use the water for their private emolument, and where the capability of availing themselves of this water power, may constitute the chief value of the adjacent land. Yet I presume no one would contend that the individual property in this water is not entirely subordinate to the public use of it, or that the owners of these mill sites would have any legal claim for indemnity, if the government, by works erected in the sea for the improvement of the navigation or the defence of the harbor of New York, should so effect the flow and reflow of the tide through those inlets, as to render the mills useless. To such a claim the answer would be that the public right to use the water was paramount, and the right of the [630] individual riparian was subordinate. In the present case the right of the state to the use of the element at the place where the dam was built, was absolute and unqualified, and if the use of it there was rightful, I can not think that the state is liable for damages which an individual having a subordinate right to the water at another place, may have sustained in consequence of its changed condition adjacent his.land. I repeat that there appears to be a manifest distinction between the right of the public in such a case to affect within its natural channel, the water adjacent the lands of individuals and the right to overflow those lands by carrying the water out of its natural channel. I fear that I may not succeed in presenting this distinction as clearly to other minds as it seems to present itself to mine; but however this may be, my conviction that such a distinction should be observed, together with other considerations which I am aware I have but imperfectly presented, compel me to vote for reversing the judgment of the supreme court.
/On the question being put, Shall this judgment be reversed? the members ' of the court voted as follows:
In the affirmative ; The President of the Senate and Senators Armstrong, J. Beardsley, L. Beardsley, Beckwith, Downing,Gansevoort, Huntington, H. F. Jones, J. P. Jones, Lawyer, Loomis and Tracy. 13.
In the negative : The Chancellor, Fox, Griffin, Hunter, Lacy, Livingston, Lounsberry, Magic, Seger, Wager, Willes. 11.
Whereupon the judgment of the ¡ -tíme court was reversed, and a venire de novo was directed to be awarded,