In the Matter of the Application of THE LONG SAULT DEVELOPMENT COMPANY, Appellant, for a Writ of Mandamus against JOHN J. KENNEDY, as Treasurer of the State of New York, Respondent.

In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK ex rel. G. WILSON BALL, Appellant, for a Writ of Mandamus against JOHN J. KENNEDY, as Treasurer of the State of New York, Respondent.

Constitutional law — pro forma decision — legislative grants of state lands under water to private corporations — unconstitutionality of act incorporating Long Sault Development Company and giving it certain rights in the St. Lawrence river — validity and effect of statutes repealing such act.

1. Litigants are entitled to something more than a decision *pro forma.* It is contrary to the policy of our law to dispose of cases in that manner, and the parties and the appellate courts ought not to be deprived of the benefit to be derived from an actual consideration of a case by the court of first instance.

2. The power of the legislature to grant land under navigable waters to private persons or corporations for beneficial enjoyment is not open to serious question. For every purpose which may be useful, convenient or necessary to the public, the state has the right to make grants in fee or conditionally for the beneficial use of the grantee, or to promote commerce according to their terms. The contemplated use, however, must be reasonable and one which

1

can fairly be said to be for the public benefit or not injurious to the public.

3. Chapter 355 of the Laws of 1907 creates a body corporate and politic under the name of the Long Sault Development Company, for the purpose of erecting, constructing, maintaining, operating and using, in connection with the St. Lawrence river, dams, canals, reservoirs, power houses, and works appurtenant thereto, at or near Long Sault island in the county of St. Lawrence, and of erecting locks and works appurtenant thereto at or near the same place, or for the development of electrical power and energy and the permanent improvement of navigation on the St. Lawrence river at and above and below said place. It further grants extensive and exclusive powers to the corporation. These rights are declared to be granted upon certain specified conditions, the most important of which is "that the rights hereby granted shall never be so used as to impair or obstruct the navigation of the St. Lawrence river, but, on the contrary, that *such navigation shall be preserved in as good condition as, if not better than the same is at present,* regard being always had to the amount of the natural flow of water in said river as affecting its navigability from time to time." The act of 1907 was repealed by chapter 452 of the Laws of 1913. *Held,* that the legislature did not possess the constitutional power to convey away the state control over the navigation of the St. Lawrence river, to the extent attempted by the act of 1907, and that the repeal thereof was effective, irrespective of the reasons assigned therefor, although it could not operate to confiscate any valid franchise or property right which the company had previously acquired under the act repealed.

*Matter of Long Sault Development Co.,* 158 App. Div. 399, affirmed.

(Argued January 6, 1914; decided June 9, 1914.)

APPEAL in each of the above-entitled proceedings from an order of the Appellate Division of the Supreme Court in the third judicial department, entered October 20, 1913, which affirmed, as matter of law, and not in the exercise of discretion, an order of Special Term denying the petitioner's application for a writ of mandamus to compel the state treasurer to accept from the Long Sault Development Company the sum of $25,000 as a payment due to the state of New York under chapter 355 of the Laws of 1907.

The facts, so far as material, are stated in the opinion.

*Henry W. Taft* and *Francis Sims McGrath* for Long
Sault Development Company, appellant.   The state has
the power to convey lands under the waters of the St.
Lawrence river to be used for the purposes mentioned in
the act.   The fact that the title of the state is held by vir-
tue of its sovereign right and in trust for the benefit of
the public does not preclude it from divesting itself of the
title for public purposes such as the improvement of navi-
gation by the building of a dam and the conservation of
water power created by such improvement.   (*Coxe* v.
*State*, 144 N. Y. 396; *I. C. R. R. Co.* v. *Illinois*, 146
U. S. 387; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *People*
v. *N. Y. & S. I. Ferry Co.*, 68 N. Y. 71; *Saunders* v.
*N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75; 3 Kent's
Comm. [9th ed.] 546; *Hoboken* v. *Penn. R. R. Co.*, 124
U. S. 656; *Stevens* v. *Paterson, etc., R. Co.*, 34 N. J. L.
532; *Rogers* v. *Jones*, 1 Wend. 237; *Kerr* v. *West Shore
R. R. Co.*, 127 N. Y. 269; *Rumsey* v. *N. Y. & N. E. R.
R. Co.*, 130 N. Y. 88; *Trustees of Brookhaven* v. *Strong*,
60 N. Y. 56.)   The constitutionality of the act must be
sustained unless it appears beyond reasonable doubt that
the act conflicts with the fundamental law and that in no
reasonable way can the provisions of the act be recon-
ciled with the Constitution.   (*Matter of Gilbert El. Ry.
Co.*, 70 N. Y. 361; *People ex rel. Henderson* v. *Super-
visors*, 147 N. Y. 1; *People ex rel. City of Rochester* v.
*Briggs*, 50 N. Y. 553; *Weismer* v. *Village of Douglas*,
64 N. Y. 91; *People ex rel. Murphy* v. *Kelley*, 76 N. Y.
475; *People ex rel. Sinkler* v. *Terry*, 108 N. Y. 1;
*Bohmer* v. *Haffen*, 161 N. Y. 390; *People ex rel. Simpson*
v. *Wells*, 181 N. Y. 252.)

*Clarence S. Ferris* for G. Wilson Ball, appellant.

*Thomas Carmody, Attorney - General* (*Claude T.
Dawes* of counsel), for respondent.   The repeal of the
Long Sault charter leaves the courts without a statute

upon which to base a writ of mandamus. There is no longer any duty to receive the money imposed upon the state treasurer. (*Meshmeier* v. *State*, 11 Ind. 482; *State* v. *Blend*, 23 N. E. Rep. 511; *People* v. *O'Brien*, 111 N. Y. 1; *Mayor* v. *Twenty-third St. Ry. Co.*, 113 N. Y. 311; *People* v. *Woodbury Dermatological Inst.*, 192 N. Y. 454; *Palmer* v. *Hickory Grove Cemetery*, 84 App. Div. 600; *Schnaier* v. *Grigsby*, 132 App. Div. 854; *People ex rel. Collins* v. *Spicer*, 99 N. Y. 225; *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Vance* v. *Rankin*, 192 Ill. 625.) The legislature cannot, under guise of improving a waterway, abdicate its sovereign control over navigation for the benefit of a private water power company. (*Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746; *Stone* v. *Mississippi*, 101 U. S. 814; *New Orleans Gas Co.* v. *Louisiana Lighting Co.*, 115 U. S. 667; *Newton* v. *Commissioners*, 100 U. S. 548; *Charles River Bridge Co.* v. *Warren Bridge*, 11 Pet. 420; *Smith* v. *City of Rochester*, 92 N. Y. 463; *Matter of City of New York*, 168 N. Y. 134; *Coxe* v. *State*, 144 N. Y. 396; *I. C. R. R. Co.* v. *Illinois*, 146 U. S. 387; *Fulton L., H. & P. Co.* v. *State*, 200 N. Y. 400.)

WILLARD BARTLETT, Ch. J. The purpose of both of these proceedings is the same and they are substantially alike except that in one case the moving party is the Long Sault Development Company, the corporation directly interested, while in the other the petitioner is a taxpayer of St. Lawrence county, where the proposed works of the corporation are to be established. They were heard together in the Appellate Division and disposed of there as one case.

The order of the Special Term contains a declaration which might preclude a consideration of the appeal if it appeared also in that of the Appellate Division, to wit: "This order is not made after a consideration of the merits, but for the purpose of expediting a final decision

upon the merits in the courts of appellate jurisdiction to which appeals herein may be prosecuted." It is contrary to the policy of our law to dispose of cases in this manner. Litigants are entitled to something more than a decision *pro forma*. Furthermore, a capable judge in the court of first instance ought not to deprive the parties or the appellate courts of the benefit to be derived from an actual consideration of the case on his part.

The purpose of this litigation is to test the constitutionality of an act of the legislature passed in 1907 to incorporate the Long Sault Development Company and grant it an important franchise on and in the St. Lawrence river. (Laws of 1907, chap. 355.) One of the conditions upon which the grant was made was the payment of $25,000 annually into the treasury of the state. On January 21, 1913, the Long Sault Development Company tendered the prescribed amount to the state treasurer, who declined to accept it on the ground that the attorney-general had pronounced the act of 1907 unconstitutional. These proceedings were then instituted; and after the applications had been denied at Special Term and while the appeals to the Appellate Division were pending the legislature repealed the act of 1907. (Laws of 1913, chapters 452, 453.)

The statute of 1907 is entitled "An Act to incorporate the Long Sault Development Company, and to authorize said company to construct and maintain dams, canals, power-houses and locks at or near Long Sault Island, for the purpose of improving the navigation of the St. Lawrence River and developing power from the waters thereof, and to construct and maintain a bridge, and carry on the manufacture of commodities."

It provides in the first section that five persons named therein and all who are or may be associated with them are thereby constituted a body corporate and politic under the name of the Long Sault Development Company, for the purpose of erecting, constructing, maintaining, oper-

ating and using, in connection with the St. Lawrence
river, a dam or dams, a canal or canals, a reservoir or
reservoirs, a power-house or power-houses, and works
appurtenant thereto, at or near Long Sault island in the
county of St. Lawrence, and of erecting a lock or locks
and works appurtenant thereto at or near the same place,
or for the development of electrical power and energy and
the permanent improvement of navigation on the St.
Lawrence river at and above and below said place; and
also of constructing and maintaining a bridge upon or
in connection with said works and of carrying on the
manufacture of commodities with the said power.

General corporate powers are conferred upon the com-
pany by the second section. Then follows, in the third
section, a declaration that said corporation shall have the
right to construct, maintain, operate and use all such
dams, canals, reservoirs, sluices, bulkheads, and appur-
tenant works as may be proper or useful to develop
water power and electrical power therefrom, at such
points on or adjacent to the south shore of the St. Law-
rence river near Long Sault island or Barnhart's island as
may be selected by said corporation (but not across the
international boundary line unless consented to by the
Dominion of Canada); and also in and upon so much of
the river and bed as lie south of the international bound-
ary line in the same locality. The company is also given
the right to erect and maintain power-houses; to take
and use the waters of the river at and above the points
of location of the authorized works; and to construct
toll bridges over and in connection with the same, for
foot passengers, animals and vehicles. These rights are
declared to be granted upon certain specified conditions,
the most important of which is "that the rights hereby
granted shall never be so used as to impair or obstruct
the navigation of the St. Lawrence river, but, on the con-
trary, that *such navigation shall be preserved in as good
condition as, if not better than, the same is at present,*

regard being always had to the amount of the natural flow of water in said river as affecting its navigability from time to time."

The fourth section of the statute provides that after Congress shall have authorized the construction of the dams, locks and canals authorized by the act, and after the corporation has paid the fixed sum of $10,000 into the state treasury, then "the commissioners of the land office shall, upon the application of said corporation, grant unto it the title and interest of the people of the state in and to lands under the waters of the St. Lawrence river to be covered or occupied by said works and locks and power-houses;" in consideration of which conveyance, as well as of the rights and privileges granted by the act, the corporation shall make certain specified payments into the state treasury which shall amount to not less than $25,000 per annum after the year 1911.

The Long Sault Development Company was duly organized under the act, and developed a plan for the construction of the works thereby authorized in co-operation with a Canadian corporation owning power on the other side of the river — the St. Lawrence Development Company, Limited. In necessary preliminary work, the acquisition of lands and riparian rights, and the payment of taxes, the Long Sault Development Company claims already to have expended upwards of $750,000.

As is generally known, the celebrated Long Sault rapids constitute a substantial obstacle to the navigation of the St. Lawrence for commercial purposes, being navigated by only one line of passenger boats during the tourist season. In the petition in this proceeding the effects of the proposed scheme on navigation are summarized as follows:

"The river, which at Long Sault is now practically unnavigable, will become navigable for all classes of vessels. Both of the contemplated locks will be continuously operated during the navigation season toll free.

Reliable and economical power will be made available within the radius of transmission of electricity from the power houses. New industries will thereby be created. There will be increased quantities of products from manufacturing plants utilizing the power, which products must be distributed by boat or rail."

The first obstacle that confronts the appellants in this case is the repeal of the statute under which the petitioning corporation was organized and by which its franchises were acquired. The repealing act sets forth four grounds upon which the legislature deems the repealed act to be unconstitutional, but it adds that "The enumeration in this act of the grounds for such repeal shall not be deemed to qualify or impair the full force and effect of the repeal." (L. 1913, ch. 452, section 4.) This provision, as it seems to me, makes the repeal effective, irrespective of the reasons assigned therefor. The repeal, however, could not operate to confiscate any valid franchise or property right which the Long Sault Development Company had previously acquired under the act repealed. (*People* v. *O'Brien*, 111 N. Y. 1.) We are, therefore, called upon to consider and determine whether the legislature possessed the constitutional power to convey away the state control over the navigation of the St. Lawrence river to the extent attempted by the act of 1907.

The power of the legislature to grant land under navigable waters to private persons or corporations for beneficial enjoyment has been exercised too long and has been affirmed by this court too often to be open to serious question at this late day. (*Lansing* v. *Smith*, 4 Wend. 9; *People* v. *N. Y. & Staten Island Ferry Co.*, 68 N. Y. 71; *Langdon* v. *Mayor, etc., of N. Y.*, 93 N. Y. 129.) The contemplated use, however, must be reasonable and one which can fairly be said to be for the public benefit or not injurious to the public. "For every purpose which may be useful, convenient or necessary to the public, the state has the unquestionable right to make grants

in fee or conditionally for the beneficial use of the
grantee, or to promote commerce according to their terms.
The extensive grant to the city of New York of the
lands under water below the shore line around Manhat-
tan Island clearly comes within this principle, since it was
a grant to a municipality, constituting a political division
of the state, for the promotion of the commercial pros-
perity of the city, and, consequently, of the people of the
state.   So, also, grants to railroads for rights of way and
other facilities for the transaction of their business, made
under the authority of the state, have been held valid
upon the same principle, as well as to corporations and
private persons engaged in commerce or navigation for
their necessary or reasonable use.   Grants to the owners
of the adjoining uplands, either for beneficial enjoyment
or for commercial purposes, have long been authorized
and recognized as one of the uses to which the state may
lawfully apply such lands." (*Coxe* v. *State of N. Y.*, 144
N. Y. 396, 407.)

If the grant to the Long Sault Development Company
fell within any of these classes it could not well be assailed.
But in substance and effect it is very much broader.   It
virtually turns over to the corporation entire control of
navigation at the Long Sault Rapids (provided, of course,
that the consent of Congress can be obtained).   All that
the corporation must do is to construct the contemplated
works, pay the stipulated sums and *keep the navigation
as good as it is now*.   No matter how much the interests
of the public may demand the improvement thereof in
the future, the state will be powerless to act either
directly or by constraint upon the corporation.   It is pre-
cisely as though the legislature should confer upon a cor-
poration exclusive authority to construct works on the
Hudson river to improve the navigation between Albany
and Troy upon condition that such navigation shall be
preserved in as good condition as the same is at present,
and thereby preclude the state from ever hereafter

improving the navigation itself. In my opinion the legislature cannot make such a contract in behalf of the state. In *Illinois Central Railroad Co* v. *Illinois* (146 U. S. 387) the attempted alienation of 1,000 acres of the harbor of Chicago was condemned on account of the extent of the area granted. Here the grant is objectionable on account of the abdication of the state's control over waters which are still to be preserved as navigable but which are to be turned over wholly to the dominion of a private corporation. In this discussion I assume that the improvement of navigation was a real, even if subsidiary, purpose of the enactment and not merely a cloak for a power development project. The point that I desire to emphasize is that the legislature cannot authorize the conveyance of a navigable portion of the St. Lawrence to a private company to maintain and control navigation thereon, thereby parting for all time with its own power to improve such navigation. The privilege of the state to control the St. Lawrence as a navigable river (subject to the direction of Congress) cannot be assigned to others in the manner attempted by this legislation. As long as the waters are maintained as navigable they remain public waters of the state; and as long as they remain public waters of the state the state is bound to retain control over them in the public interest. "The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace." (*Illinois Central Railroad Co.* v. *Illinois, supra*, p. 453.)

There are many other interesting features in this case;

but it is not necessary to discuss them if I am right in the conclusion which has been stated. If the abdication of state control over the St. Lawrence as a navigable river at the Long Sault vitiates the entire statute, as I think it does, it follows that neither the Long Sault Development Company or its successors in interest, if it be deemed dissolved, have any rights against the state or its officers to be enforced by mandamus or otherwise.

The orders appealed from should be affirmed, with costs.

COLLIN, J. (dissenting). Appeal by the Long Sault Development Company from the order of the Appellate Division of the Supreme Court in the third judicial department, entered October 24, 1913, which affirmed, as a matter of law and not in the exercise of the court's discretion, an order of the Special Term which denied the application of the appellant for a writ of mandamus to compel the treasurer of the state of New York to accept $25,000 from the appellant in payment of the amount it alleged to be due from it to the state for the year 1912, under the provisions of chapter 355 of the Laws of 1907. After the argument in the appeal and pursuant to the permissive order of this court, an intervening brief in behalf of the Lawyers Title Insurance and Trust Company, the Title Guarantee and Trust Company and the American Sugar Refining Company of New York and an answering brief in behalf of the respondent were filed.

The chapter mentioned is entitled "An Act to incorporate the Long Sault Development Company, and to authorize said company to construct and maintain dams, canals, power-houses and locks at or near Long Sault island, for the purpose of improving the navigation of the St. Lawrence river and developing power from the waters thereof, and to construct and maintain a bridge, and carry on the manufacture of commodities."

It will be necessary to state, in part, the substance of

certain of its eleven sections. Section 1 created the appellant a corporation "for the purpose of erecting, constructing, maintaining, operating and using, in connection with the Saint Lawrence river, a dam or dams, a canal or canals, a reservoir or reservoirs, and a power-house or power-houses and works appurtenant thereto, at or near Long Sault island, in the county of Saint Lawrence, and of erecting and constructing a lock or locks, and works appurtenant thereto, at or near the same place, all for the development of electrical power and energy, and the permanent improvement of navigation on the Saint Lawrence river at and above and below said place; and also of constructing and maintaining a bridge upon or in connection with said works, and of carrying on the manufacture of commodities with the said power." Section 2 defines the general corporate powers. Section 3 provides that the corporation shall have the right to construct, maintain and use "all such dam or dams, canal or canals, reservoir or reservoirs, gates, sluices, trunks, pipes, bulkheads, piers, flumes, abutments, and other works appurtenant thereto, as may be proper or useful for the purpose of the development of water power, and of electrical power and energy therefrom, at such point or points upon or adjacent to the south shore of the Saint Lawrence river, near Long Sault island or Barn-hart's island, and upon the said islands, or either of them, and between said islands, and between said islands or either of them and the shores of the said river and Sheik's island (but not across the international boundary line unless consented to by the Dominion of Canada), as may be selected by said corporation, and also in and upon so much of the said river and the bed thereof as lies to the south of the international boundary line, at or near Long Sault island or Barnhart's island, either independently or in connection with like works now erected, or to be erected, in so much of said river and the bed thereof as lies to the north or Canadian side of said

international boundary line, and upon and adjacent to the northerly shore of said river; and to erect, construct, maintain, operate and use a power-house or power-houses, and conductors, cables, wires, insulators and other appliances in connection with the said works for the development of electrical power and energy; and also to take and use the waters of said river at and above the points of location of said works heretofore authorized, and to construct and maintain upon, over and in connection with said dam or dams and other works, a bridge or bridges across or partly across the Saint Lawrence river, with the approaches thereto, for the use of foot passengers, animals and vehicles, and to charge reasonable rates of toll for passage thereon; the said rights being granted upon the express condition that said corporation shall make just compensation to all persons injured by the exercise of the rights and privileges heretofore granted, and that said corporation shall also erect and construct a lock or locks as may be required by the United States of America, and shall provide electrical power or energy for the maintenance, operation and use of said lock or locks, free of charge, and shall in all other respects perform, fulfill and abide by all and singular the conditions and provisions of this act, and also of any act of the Congress of the United States relating thereto, and also upon condition that the rights hereby granted shall never be so used as to impair or obstruct the navigation of the Saint Lawrence river, but, on the contrary, that such navigation shall be preserved in as good condition as, if not better than, the same is at present, regard being always had to the amount of the natural flow of water in said river as affecting its navigability from time to time." Section 4 directs the commissioners of the land office to grant unto the corporation, upon its application and after the payment by it to the state of $10,000 and after the United States shall authorize the construction of dams, locks and canals as provided, "the title and interest of the people of the

state in and to lands under the waters of the Saint Lawrence river to be covered or occupied by said works and locks and power-houses," imposes a forfeiture and reverter thereof unless the lands are actually used by said corporation for the authorized works, within fifteen years from the grant, and directs that "in consideration of the conveyance so made under the authority of this act, as well as for the rights and privileges hereby granted, the said corporation in addition to the payment aforesaid [of $10,000] shall pay into the treasury of the state for the year nineteen hundred and ten the fixed sum of fifteen thousand dollars, and for the year nineteen hundred and eleven the fixed sum of twenty thousand dollars. For each year after nineteen hundred and eleven, the said corporation shall" make payments based upon the average amount of electrical horse power generated during such year under the authority of the act, "and if for any year after nineteen hundred and eleven the amount payable at rates aforesaid is less than twenty-five thousand dollars, then said corporation shall pay for such year the sum of twenty-five thousand dollars instead of the amount that would be payable at the rates aforesaid." The payment of each year shall be payable on or before February 1 in the following year, and "in case the said corporation shall fail to pay any amount due hereunder within sixty days after the same is payable as herein provided, in addition to any other remedies which may exist by law, the rights and privileges hereby granted may be forfeited." The payments are based upon the assumption that the corporation under the authority of the act, "subject only to the lawful control of the United States government, may use for the purposes herein specified, at the places herein mentioned, all of the waters of the Saint Lawrence river south of the international boundary line, but in case said corporation shall at any time be compelled to make any payment to the Dominion of Canada or the Province of Ontario for

the use by said corporation of any portion of said water to generate power as authorized by this act, said corporation shall be entitled to an equitable readjustment of the rate of compensation to be paid to the state for that portion of the said water for the use of which said corporation shall be compelled to make payment to said dominion or province," and there follows a provision for making the readjustment by arbitration. In the following sections it is provided that any portion of the assets and the franchises and rights appurtenant thereto may be sold upon a prescribed condition "but subject always to all the conditions and provisions of this act;" that the existence of said corporation shall be perpetual; that the corporation "shall begin the work of construction of its dam pursuant hereto within one year after the Congress of the United States shall authorize the construction of dams, locks and canals hereby authorized, and in case such construction shall not be so begun the grants, rights and privileges hereby granted may be forfeited," and that the act shall take immediate effect.

The corporation has complied with and expended in good faith a large sum of money under the provisions of the act. The United States have not authorized the construction of the dam and other structures contemplated by the act. The corporation has not generated any electrical horse power. Under the terms of the act, therefore, $25,000 became payable by the corporation into the treasury of the state on or before February 1, 1913. The treasurer of the state refused on January 27, 1913, to receive such payment upon the ground that the act was unconstitutional and void. This proceeding, instituted February 10, 1913, is to compel him to receive it. Other legislative enactments are, however, to be considered.

While the appeal to the Appellate Division was pending, the legislature passed two acts relating to the present controversy. One of them, passed May 8, 1913, is chap-

ter 452 of the laws of that year. It is entitled "An act to repeal chapter three hundred and fifty-five of the laws of nineteen hundred and seven, entitled [then follows the title as already given], providing for the repayment to such company of certain moneys paid by it under such act and making an appropriation therefor." The first section enacts that the chapter 355, describing it by the title, "is hereby repealed upon the following grounds." Four grounds are then stated. Section 2 directs the state comptroller to repay, from the moneys appropriated by the act, to the corporation all sums paid by it into the state treasury with interest, and enacts: "Such company is continued in existence for the purposes only of receiving and giving proper vouchers for said moneys, making proper distribution or application thereof among its members or other persons entitled thereto, and the winding up of its affairs." Section 3 appropriates a sum for the purpose expressed in section 2. Section 4 is: "The enumeration in this act of the grounds for such repeal shall not be deemed to qualify or impair the full force and effect of the repeal," and section 5 gives the act immediate effect.

The other of them, passed May 8, 1913, is chapter 453 of the laws of that year. It is entitled "An act to confer jurisdiction upon the board of claims to hear, audit and determine the alleged claims, if any, which may be presented by the Long Sault Development Company against the state of New York by reason of the repeal by the legislature of chapter three hundred and fifty-five of the laws of nineteen hundred and seven." Section 1 confers upon the board of claims jurisdiction to hear and determine the alleged claims, if any, which may be presented by the company against the state by reason of the said repeal, creates the consent of the state thereto, provided that such alleged claims, if any, shall be filed with the board of claims within six months after the act takes effect, and provides that no award shall be made except

upon such legal evidence as would establish a liability against an individual or corporation in a court of law or equity. Section 2 is: "Nothing herein contained shall be regarded as conceding the validity of any of such alleged claims upon the part of the state growing out of the enactment" of the chapter 355 and by the repeal of it, nor as waiving, on behalf of the state, any defense thereto. The act is given by section 3 immediate effect.

Additional facts will be hereinafter stated.

It is the legal duty of the state treasurer to receive all moneys paid into the treasury of the state. (State Finance Law, Laws 1909, ch. 58 [Cons. L. ch. 56], sec. 3.) If the terms of the chapter 355 had upon its passage validity which chapter 452 of the Laws of 1913 has not withdrawn or destroyed, the $25,000 were, when refused by the state treasurer, payable into the state treasury, and he was obligated and may be directed by the writ of mandamus to receive them. (*People ex rel. Cayuga Nation of Indians* v. *Commissioners of Land Office*, 207 N. Y. 42.) A fundamental question, therefore, is, was chapter 355 lawful and valid, because if it was void the mandamus was rightfully withheld (*People ex rel. Sherwood* v. *State Board of Canvassers*, 129 N. Y. 360), and if it was valid a further question is, did the act of 1913, if valid, annul the rights and privileges of the corporation or the obligation of the corporation to pay the $25,000 that they might not be subject to forfeiture and extinction? It may well be here stated that the rights of neither riparian owners nor the United States are involved under this appeal.

I consider first the assertion that chapter 355 is invalid and ·inoperative because it provides (a) for the alienation by the state of title to lands under the water of the St. Lawrence river, and (b) for the abdication by the legislature of its sovereign control over navigation for the benefit of the private corporation. I take judicial notice that the St. Lawrence river is navigable and a

2

boundary between the United States and the Dominion of
Canada. The title of the state to that part of it southerly
of the boundary line between the two countries is, prop-
erly, not questioned by any party. The riparian owners
did not have title to it, because the rule of the com-
mon law of this state (enlarging or extending that of
England) that the title to the bed of navigable rivers,
not tidal, is in the owners of the adjacent banks, is
not applied to rivers constituting the boundary lines
between nations. (*Fulton L., H. & P. Co.* v. *State of
New York*, 200 N. Y. 400; *Canal Appraisers* v. *People*, 17
Wend. 570, 598, 599; *Matter of Comrs. State Res. at
Niagara*, 37 Hun, 537, 547.) Nor has it been applied,
for certain exceptional reasons, to portions of the Hudson
and Mohawk rivers. (*Fulton L., H. & P. Co.* v. *State
of New York*, 200 N. Y. 400.) From the formation of
the Federal government, it has been held, without inter-
ruption, that the title to the lands under all inland
waters, navigable in fact, was not in the United States,
but in either the state or the grantees, as the law of the
state declared. (*United States* v. *Chandler-Dunbar W.
P. Co.*, 229 U. S. 53.) The title of the state to the bed
of the St. Lawrence is, however, not proprietary and
absolute. It is vested in the state as the representative
of the people. A navigable river is, at common law, a
public highway which had existence when the political
community and government within whose jurisdiction it
is arose. Inasmuch as the title to the waters and the
land under them cannot well, according to the common-
law concept of title, as ownership in a determinate body,
be vested in all the people of a state, the wisdom of the
law has placed the title, originally, in the state, with the
right of the state to grant certain interests therein, sub-
ject, however, under either ownership to certain rights
common to all, chief of which are those of navigation
and fishing. Such public rights are not affected by the
location of the title, whether in the state or in private

owners.   In either case the ownership is representative of all the people, whose interests are property interests or rights and not mere privileges or immunities of citizenship.

The doctrine that the title to the navigable waters of the state is held thus representatively for the use and benefit of the people inheres in general principles of the common law of England which long antedate our state or federal constitutions, and had their origin in rights conceded to the crown centuries before the revolution. The crown, by virtue of the title thereto deemed to be vested in it, could grant the soil of tidal waters, which alone English common law held navigable, so that it should become private property — the *jus privatum* — but the grant was subject to the paramount right of public use — the *jus publicum* — which the crown could neither destroy nor abridge.   But while the crown could make no grant in derogation of the common rights, Parliament might do so.   Under the colonial charters all rights belonging to the English government were conferred upon its representatives in this country.   The title of the crown, both the *jus privatum* and the *jus publicum*, with rights of regulation and control in Parliament in the interest of the people, came to the colonies and afterwards passed to the several states.   The state, through the Federal Constitution, delegated to the Federal Congress the power to regulate commerce among the several states and with foreign nations and thereby subjected itself to a right, superior to its own, to control the waters and soil of its navigable waters so far as may be necessary for the regulation of interstate or foreign commerce. Until Congress acts on the subject, the power of the state is plenary.   The nature and quality of the title of the state when the chapter 355 was passed was as above delineated.   We are to determine whether the effects of the chapter were invalid as to such title.

A critical study of the part of chapter 355 relating to the granting of the soil to and the use of the waters by

the corporation epitomizes its cardinal effects as follows: The legislature granted to it the right (dependent upon the authorization of Congress) to construct and use upon the bed of a part of the river, specified but of unstated extent, the structures, including dams and canals, proper or useful for the development of water power and of electrical power and energy therefrom and in connection therewith a toll bridge or bridges, and to take and use the waters of the river, subject to the lawful control of the United States at and above the location of the structures, and that it "shall in all other respects perform, fulfill and abide by all and singular the conditions and provisions of this act, and also of any act of the Congress of the United States relating thereto, and also upon condition that the rights hereby granted shall never be so used as to impair or obstruct the navigation of the Saint Lawrence river, but, on the contrary, that such navigation shall be preserved in as good condition as, if not better than, the same is at present, regard being always had to the amount of the natural flow of water in said river as affecting its navigability from time to time." (Section 3.) After the United States shall authorize the construction of the structures and a prescribed payment is made to the state by the corporation, the state shall, upon its application, convey to it the lands of the river to be occupied by the structures. The corporation shall begin the work of constructing its dam within one year after Congress shall authorize the construction of the dams, locks and canals, failing in which the grants and rights may be forfeited.

The provision for conveying the lands of the river to be occupied by the structures, in and of itself and apart from the authorized use, is not *ultra vires* of the state or in contravention of its obligations as the representative owner of them. The common law always yielded to the crown the right to convey the soil of navigable waters, but the grant was subject to the right of public

use, which Parliament could, at least, regulate and derogate. It is well established in this country that the legislature of the state may, as the representative of the people, grant the soil of or confer an exclusive privilege in navigable rivers or waters held by it for the people, or authorize a use inconsistent with the public right, or interfere with the rights of navigation, so far as the public is concerned, when acting in the public interest, subject to the paramount control of Congress. (*People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75; *Shively* v. *Bowlby*, 152 U. S. 1, 48–50; *Barney* v. *Keokuk*, 94 U. S. 324; *Langdon* v. *Mayor, etc., of N. Y.* 93 N. Y. 129, 154; *People ex rel. H. & M. R. R. Co.* v. *State Board Tax Commissioners*, 203 N. Y. 119, 129.)

The provisions granting to the corporation the right to construct within the river the designated structures and to take and use the waters as specified for the development of water power and of electrical power and energy present important questions. The conservation and application of natural water powers for generating electrical power which can be transmitted through long distances has achieved under modern knowledge and conditions an importance and utility in promoting the public advantage undreamed of when waterways were the chief channels of transportation. The people of the state are the beneficial proprietors of the St. Lawrence river. The usufruct of it belongs to them and cannot be granted or destroyed by the legislature. It does not exist, however, solely in the common right of navigation. Other uses may promote the public welfare and prosperity and make the usufruct more valuable, although they are inconsistent with and a curtailment of free and unimpaired navigation. While it is the duty of the legislature to protect the public interest in navigable waters against infringement, the use of them is not restricted to navigation and its accessories, and the interests of the people

may justify other public uses in connection with and to the obstruction and embarrassment and, perhaps, in substitution of it. Although the legislature cannot abolish the agencies and conditions under which the people of the state are a society and accomplish their manifold affairs or divest them of sovereignty over any part of the territory of the state, it possesses completely the legislative power of the people retained under the federal and state constitutions. (*People ex rel. Simon v. Bradley*, 207 N. Y. 592; *Gautier* v. *Ditmar*, 204 N. Y. 20.) In *People* v. *Baltimore & .O. R. R. Co.* (117 N. Y. 150, 155) we considered the validity of an act authorizing the department of docks of New York city to authorize the possessor of any pier or bulkhead for transportation purposes to erect sheds for the protection of cargo and thus withdrawing from public use what was in legal contemplation a public highway. Judge GRAY, writing for the court, said: "The right to exercise the sovereign power of the people was vested in the legislative body; whose acts are supreme, when confined within the limits fixed by the Constitution of the state. An eminent dominion over all property in the state is an incident of the sovereign power. * * * If an exercise of this power, as for instance, as in this case, by permitting a use and an appropriation of a public pier to some other or *quasi* private use in the way proposed by the defendant, affects some existing or natural right of the public to the use of a highway, I cannot find in the organic law of the state, nor can I find upon principle any restriction upon the legislative action, other than that it shall be in the direction of public utility. It seems to me self-evident as a proposition that the sovereign power, subject to the restrictions interposed by the fundamental law, may be exercised with respect to the public as well as the private rights of citizens. That seems to follow logically as the necessary understanding of the governed of the scope and design of the political dominion of the state, and it finds

reason and support in the principle underlying all forms of government that, for ends of the public utility and good, all other ends should yield." It is not contended that every grant of the government is injurious to the interests of the people or that every grant of a franchise in navigable waters must necessarily be so. The erection of a dam or a bridge therein may be of the highest utility to the people. It may essentially promote the public convenience and aid the public interests, and protect the public property. And if persons are found willing to undertake such a work, receiving in return the profit it may produce, surely it cannot be said, as of course, that such a grant under such circumstances is *per se* against the interests of the people. Whether the grant of a franchise in navigable waters is or is not on the whole promotive of the public interests is a question of fact and judgment confided to the sober consideration of the legislature which is invested with full discretion, and possesses ample means to decide it. It has an exclusive right to make the grant, and it is to be presumed that it emanated from a high sense of public duty, to promote the public welfare, and to establish the public prosperity. The cases in which the legislatures have validly authorized the obstruction of navigable rivers are numerous. Among them are, relating to dams, *Willson* v. *Blackbird Creek Marsh Co.* (2 Pet. 245); *State ex rel. Wausau St. Ry. Co.* v. *Bancroft* (148 Wis. 124); *Parker* v. *Cutler Milldam Co.* (20 Me. 353); *State* v. *Godfrey* (24 Me. 232); *United States* v. *Bellingham Bay Boom Co.* (176 U. S. 211); *Renwick* v. *Morris* (7 Hill, 575); *Pound* v. *Turck* (95 U. S. 459); *Adams* v. *Ulmer* (91 Me. 47); *People* v. *Rensselaer & S. R. R. Co.* (15 Wend. 113, 131); *Crittenden* v. *Wilson* (5 Cow. 165); *Ensworth* v. *Commonwealth* (52 Pa. St. 320); relating to booms: *Mullen* v. *Log-Driving Co.* (90 Me. 555); *J. S. Keator Lumber Co.* v. *St. Croix Boom Corp.* (72 Wis. 62); relating to bridges: *People ex rel. Murphy* v. *Kelly* (76 N. Y.

475); *Miller* v. *Mayor of N. Y.* (109 U. S. 385); *Commonwealth* v. *Breed* (4 Pick. 460); *Flanagan* v. *City of Phil.* (42 Pa. St. 219); *State* v. *Leighton* (83 Me. 419); *Hickok* v. *Hine* (23 Ohio St. 523); *Comrs.* v. *Board of Public Works* (39 Ohio St. 628); *Commonwealth* v. *Inhabitants of Taunton* (7 Allen, 309); *Enfield Toll Bridge Co.* v. *H. & N. H. R. R. Co.* (17 Conn. 40); *Atty.-General ex rel. Easton* v. *N. Y. & Long B. R. Co.* (24 N. J. Eq. 49). We make no reference to the large class of cases of valid grants under which areas of navigable waters have been reclaimed or filled in by wharves or similar structures. Interference with navigation is a question of public expediency and advantage, and its determination is for the discretion and judgment of state and federal legislatures and not for the courts, which may not meddle or intervene unless and until the legislature plainly transgresses against the representative character of the technical title vested in it by virtue of its sovereign entity and bestows grants wholly unrelated to the common usufruct. Such was the legislative action reviewed and condemned in *Coxe* v. *State of N. Y.* (144 N. Y. 396) and *Illinois Central Railroad Co.* v. *Illinois* (146 U. S. 387).

A water power generating electrical power accessible to any considerable section of the state must be deemed advantageous and beneficial to the public. The power which propels the instruments of transportation or imparts motion to the implements and processes of industry is quite as advantageous to commerce and trade as are the instruments and the implements themselves. The profit which may be made or the private capacity of its receiver does not subtract from the public advantage. Many enterprises of the highest public utility are productive of great and immediate benefits to individuals. To the legislature the courts must leave the duty of regulating the use of the public waters as the varying interests of commerce, trade and navigation may require.

The chapter 355 intended to preserve the navigation

of the St. Lawrence river.    Without again quoting, I call attention to the provisions relating to its navigability in the title and in sections, 1, 3, 4 and 9.    The courts cannot impute to the legislature dishonest or undisclosed intentions or designs contradictory of those expressed.    If the act can be upheld upon any view of public expediency, we must assume such view was the legislative, and not annul it.    (*Waterloo W. M. Co.* v. *Shanahan*, 128 N. Y. 345; *People ex rel. Wood* v. *Draper*, 15 N. Y. 532.) Every intendment is in favor of the validity of a statute and the courts will not enter upon any independent inquiry as to facts outside of the statute itself for the purpose of nullifying it.    (*Matter of N. Y. El. R. R. Co.*, 70 N. Y. 327.)

Chapter 355 did, in fact, preserve the navigability of the river.    Unquestionably and concededly, the grant to the corporation was in its entirety conditioned upon the acquisition by the corporation of authority and direction from Congress as to the first and all constructions by it in the river. It could not enter upon or interfere with the river, under the act, until Congress had sanctioned its proposed works by authorizing the construction of the dams, locks and canals.    This, of necessity, implies accurate and complete congressional knowledge of the character, location, extent and effects of those authorized structures.    Until Congress had acted in the matter, the state had the unbounded and unrestricted right to exercise and effectuate its judgments in improving the navigability.    (It will be understood, of course, that throughout this opinion I am speaking only of the part of the river within the state.) The act did not to any extent impede or shackle the state.    It did not give to the corporation or take from the state any control whatsoever of the navigation.    The state remained, in so far as the act was concerned, as free and powerful to work its will, in the public interest, in regard to the river and its navigation as it was before the act was passed or would have been in its absence.    There

was no provision in the act which stayed the hand of the state pending the action of Congress in the matter or which directly or through reasonable implication fettered 'or withdrew, or turned over to the corporation, to any extent or in any particular the control held by the state, at the passage of the act, of navigation or the waters desired therefor.   There was no language in it which would have branded as illegal or unfair whatever action concerning navigation the state might have taken.   The control of navigable waters, if alienable at all, should only be so by an instrument showing a clear and undoubted intention on the part of the legislature to that end.   (*Sage* v. *Mayor, etc., of N. Y.*, 154 N. Y. 61; *People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71.)   The act in this regard was, in effect, the grant of such land under the water as the structures approved and authorized by Congress should cover, and of the right to use for a water power such surplus water as navigation regulated and controlled by Congress should not require, the grant, however, to have and take no effect until Congress had acted in the matter.   Whenever Congress acted in the matter, it drew and retained unto itself exclusive and paramount control over the navigation and waters of the river for that purpose.   Thereafter and thereupon such control was vested exclusively in Congress, by virtue, not of the act, but of the authority delegated by the state through the Federal Constitution.   Congress may alter or obliterate whatever the state had placed or caused to be placed in the river in aid or improvement of navigation or other public utility, and, as has been held by the courts of the United States, might remove or change whatever structures it may have authorized the corporation to construct, as the navigation from time to time, in its judgment, required.   (*Union Bridge Co.* v. *United States*, 204 U. S. 364; *Escanaba Company* v. *Chicago*, 107 U. S. 678; *St. Anthony Falls Water Power Co.* v. *St. Paul Water Comrs.*, 168 U. S. 349.)   The act did not

authorize a grant of the soil or a use of the waters of the river in derogation of the right of the state to control them for the purpose of navigation. It did not, as of course it could not, affect the power of Congress over them.

I consider next the assertion that the authority to grant the lands to be occupied by the structures in the river is in violation of article 7, section 7, of the Constitution of the state. The section provides: "The lands of the state, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed. (Const. 1894.) But the legislature may by general laws provide for the use of not exceeding three per centum of such lands for the construction and maintenance of reservoirs for municipal water supply, for the canals of the state and to regulate the flow of streams." (Amendment of Nov. 4, 1913.) This provision took effect January 1, 1895. The forest preserve was then fixed by law (Laws of 1893, ch. 332, § 100) as follows: "The forest preserve shall include the lands now owned or hereafter acquired by the state within the counties of Clinton, except the towns of Altona and Dannemora, Delaware, Essex, Franklin, Fulton, Hamilton, Herkimer, Lewis, Oneida, Saratoga, St. Lawrence, Warren, Washington, Greene, Ulster and Sullivan, except 1. Lands within the limits of any village or city and 2. Lands, not wild lands, acquired by this state on foreclosure of mortgages made to the commissioners for loaning certain moneys of the United States usually called the United States deposit fund." The lands to have been granted upon the authorized application of the corporation are in St. Lawrence county. Long Sault island and Barnhart's island, mentioned in section 3 of the act, as already quoted, are and have been for more than fifty years settled

as farming communities; the lands on the mainland adjacent to the islands and through the distance of twenty-five miles from the river are (except those within two villages) and have been for more than thirty years used for farming purposes and without forests other than as left by the owners to afford necessary firewood. While the language of the statute is clear and definite, it should be applied and enforced reasonably and as contemplated by the legislature. If the state held or should acquire upon the bank of the river at this point a tract of land for prison, hospital, armory, canal or highway purposes, a reasonable and intelligent apprehension of the intent and purpose of the act would not permit the conclusion that it was included within the forest preserve. The application of the act to it, as to the lands involved in this appeal, produces effects which are unreasonable and purposeless. It is a familiar rule that it is not the province of the courts to supervise or revise legislation, and a law plain and certain in its meaning declares itself and is insusceptible of interpretation. Uncertainty does not spring alone, however, from uncertainty of expression. It is always presumed, in regard to a statute, that no unjust or unreasonable result was intended by the legislature. Hence, if viewing a statute from the standpoint of the literal sense of its language, it works such a result, an obscurity of meaning exists, calling for judicial construction. The courts must in that event look to the act as a whole, to the subject with which it deals, to the reason and spirit of the enactment, and thereby determine the true legislative intention and purpose; and if such purpose is reasonably within the scope of the language used, it must be taken to be a part of the statute the same as if it were plainly expressed. (*Matter of Meyer*, 209 N. Y. 386.)

In ascertaining the intention of the legislature, we may take judicial notice of the relevant facts of current history which are generally known within the limits of our

jurisdiction. (*People* v. *Snyder*, 41 N. Y. 397; *Howard* v. *Moot*, 64 N. Y. 262; *Trustees Ex. F. Ben. Fund* v. *Roome*, 93 N. Y. 313.) Prior to 1872 the state made facile and extravagant disposition of the forest lands in the Adirondack territory or wilderness. In that year a policy looking to the preservation of those forests and the vesting in the state the title to a large part of those lands was conceived. Through the succeeding dozen years official commissions and legislative committees investigated and reported in the matter. Those reports demonstrate that the profound and fundamental motive and purpose in the legislative creation of the forest preserve was the preservation and restoration of the forests of the territory located within the mountainous and semi-mountainous region in order that the sources, in large measure, of the waters of the Hudson, the Mohawk and Black rivers might not be extinguished. The protection of those rivers was the inducement and justification of forest ownership in that region by the state. In 1883 the legislature passed two acts (Laws of 1883, chapters 13 and 499) as the first legislative results of the policy inaugurated in 1872, but it was not until 1885 that the forest preserve was created (Laws of 1885, ch. 283) in substantially the same terms as it was continued by the act of 1893 (Laws of 1893, ch. 332). This legislative action was based upon the reports and recommended bills of the Sargent commission transmitted by the comptroller to the legislature January 23, 1885. (3 Lincoln's Const. Hist. of New York, pp. 391–454.) Appended to the report was a detailed statement of wild or forest, cleared and improved lands in the Adirondack territory, which did not mention any land in any of the towns of St. Lawrence county adjacent to the river. The lands within that county under or within the general vicinity of the St. Lawrence river are not part of the watershed supplying the Hudson, Mohawk or Black rivers. Through scores of years prior to the statute the state had held the title

to the soil of the river for uses wholly unrelated to those inducing the creation of the forest preserve. It was widely detached from any part of the mountainous or semi-mountainous or forest lands, and the intervening lands were agricultural in nature and in fact. We conclude, for the reasons stated, that the lands under the river at the locality designated in chapter 355 are not a part of the forest preserve as fixed by law when the constitutional provision was adopted.

I turn now to the assertion that chapter 355 violated section 18 of article 3 of the State Constitution. The section contains the provision: "The legislature shall not pass a private or local bill in any of the following cases: * * * Granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever." The chapter is a private act. (*Economic P. & C. Co.* v. *City of Buffalo*, 195 N. Y. 286.) The argument of the attorney-general is that the effect of the act was, through the operation of physical laws, although not through the language of the act, the granting of the exclusive franchise of controlling for the purpose of electrical power and energy the waters of the river at a point which is not fixed with precision; that by no possibility either before or after a grant of lands under water to the company, could the state, without violation of the act, grant to others the right to use for any purpose whatever the waters around those islands or for miles up and down the river. The principle underlying the argument would make the constitutional provision invalidate every franchise for the construction of a dam in the waters of the state. Every dam of river waters makes impossible the useful construction of another within a distance either above or below it and the utilization through another of the water for power purposes in that part of the river. The argument is fully answered by the decisions of this court. In *Matter of Application of Union Ferry Co. of Brooklyn* (98 N.Y. 139,

153) the company sought to condemn under a permissive statute a privately owned pier.    (Laws of 1882, chap. 259.) The owners claimed the protection of the constitutional provision under consideration.    Judge RAPALLO writing for the unanimous court said: "But it is contended that this designation of the particular piece of property to be condemned for the purposes of the ferry renders the grant of the privilege or authority exclusive, inasmuch as no one but the grantee of the power can take the same property.    That, however, is not, in our judgment, the nature of the exclusiveness contemplated by the Constitution.    The exclusiveness prohibited is one which is created by the terms of the grant, not that which results from the nature of the property or right granted. Where, from the nature of the case, it is impossible that the right or power should be possessed or employed by more than one party, and it is important to the public interest that it should exist and be exercised by some one, the state must necessarily have authority to select the grantee.    In such a case the exclusiveness is not produced by the grant, but results from the nature of the thing granted, and to this extent every grant to a corporation or an individual, of the right to acquire real estate, is exclusive.    Where a toll bridge is authorized to be erected at a particular locality, the right to that particular bridge is necessarily exclusive.    So of all lands acquired by a railroad company for depots, car yards, etc., their right to enjoy those lands is exclusive.    The right of the owner of upland to fill out into waters of the state in front of his land is exclusive in respect to the particular property involved, though a similar right may be conferred upon every person owning lands similarly situated.    *  *  *  We think that in all these cases the exclusion of others from the enjoyment of rights or privileges similar to those bestowed upon the particular grantee must, in order to come within the constitutional prohibition, result from the provisions

of the grant and not from the inherent nature of the right granted." (See, also, *Syracuse Water Co.* v. *City of Syracuse,* 116 N. Y. 167, 186; *Bohmer* v. *Haffen,* 161 N. Y. 390.) Whether the chief purpose of the chapter 355 was to improve navigation or to supply to a section of the state electrical power is immaterial here as either result is a service to the public.

The next inquiry is, did the chapter 355 violate article 3, section 16, of the State Constitution. The section is: "No private or local bill, which may be passed by the legislature, shall embrace more than one subject, and that shall be expressed in the title." As already stated, the chapter is a private act. In the recent case of *Economic P. & C. Co.* v. *City of Buffalo* (195 N. Y. 286) Judge CHASE carefully and exhaustively stated the purpose and scope of the section. Our full duty will be done in applying to the act the enunciations of Judge CHASE. The act dealt with the single subject, namely, the creation of the corporation, the Long Sault Development Company. In case the name of the corporation, as stated in the title of the act, had indicated or suggested with a reasonable and fair degree of clearness and certainty the powers and objects of the corporation, the mere title "An Act to incorporate the Long Sault Development Company" would have been an adequate and valid expression of the subject. The act, however, gave an ampler and more informing expression of the subject of the act by stating in a general way objects of the corporation as follows: "* * * to construct and maintain dams, canals, power-houses and locks at or near Long Sault island, for the purpose of improving the navigation of the St. Lawrence river and developing power from the waters thereof, and to construct and maintain a bridge, and carry on the manufacture of commodities." The title fairly and reasonably expressed the subject of the act. The body of the act did not contain objects or rights of the corporation which were foreign to or incongruous with

the title of the act or the name of the corporation. It does not startle or surprise the ordinary mind familiar with titles to read in the body of the act that the corporation might ask for and receive the grant of the soil to be occupied by its authorized works, nor that an object was "to construct and maintain upon, over and in connection with said dam or dams and other works, a bridge or bridges across or partly across the St. Lawrence river, with the approaches thereto, * * * and to charge reasonable rates of toll for passage thereon." The construction of a bridge at the designated locality is as suggestive of tolls as that of a railroad is of fares. (*Parker* v. *Elmira, C. & N. R. R. Co.,* 165 N. Y. 274.) The part of the title relating to a bridge would suggest to an interested person that he should consult the body of the act for details and exactness in the matter. The purpose of the title is to call attention to the subject of the act, so that a person reading it may know what matter is being legislated upon, and it is sufficient when broad enough to accomplish that purpose. I find in the body of the act no subject not expressed in the title, and no object of the corporation inconsonant with those stated in the title or with the name of the corporation.

I conclude that the chapter 355 was constitutional and valid.

It is argued by the counsel for the corporation that chapter 452 of the Laws of 1913 — the repealing act — is unconstitutional and void as a whole for the reasons that (a) the provisions for the repayment of the moneys paid to the state were unconstitutional for several reasons, and an inducing cause of the legislation, and (b) this court cannot say that the legislature would have passed the act if the unconstitutionality of the Long Sault Development Company's charter had not by its terms been expressly assumed.

Section 1 of article 8 of the Constitution provides: "Corporations may be formed under general laws; but

3

shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed." Under this section the legislature had the undoubted right to extinguish by a repeal of the chapter 355 the existence of the corporation. (*People* v. *O'Brien,* 111 N. Y. 1.) A repealing clause in a statute may be valid, although every other clause is unconstitutional, if such is manifestly the legislative intent. (1 Lewis' Sutherland Stat. Const. [2nd ed.] § 245; *People ex rel. Angerstein* v. *Kenney,* 96 N. Y. 294; *Campau* v. *City of Detroit,* 14 Mich. 275; *State ex rel. Law* v. *Blend,* 121 Ind. 514.)

The arguments of counsel in relation to, as well as the contents of, chapters 452 and 453 of the Laws of 1913 have been studied and considered by me; I do not deem it necessary or useful to discuss them here for the reason that my clear and certain conviction, based upon the language itself of the two chapters, is that the legislature in intention and in language absolutely repealed chapter 355 of the Laws of 1907, saving and preserving, however, the existence of the corporation for the purpose, at least, of winding up its affairs. That conclusion having been reached, it is not necessary that we should, and it is prudent that we should not, express an opinion as to either the validity or effects of the other provisions of the statutes, which may clearly be disregarded without destroying the integrity of the repealing provisions.

The validity of the chapter 355 being established, the special franchises and rights granted by it, in so far as they were or had become property (and in this regard we must accept the allegations of the petition, which are not disputed), were held under the guaranties which protect other property and were not destroyed or confiscated through the appeal. (*People* v. *O'Brien,* 111 N. Y. 1;

*New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 673; *Lothrop* v. *Stedman*, 42 Conn. 583.)

The Appellate Division decided that the acts of 1913 constitute an attempted condemnation of the special franchise granted the corporation. I cannot concur in that view. Eminent domain is inherent in sovereignty, and the right to exercise it is legislative. The courts cannot instigate or authorize it. It forcibly takes from the citizen his property, and a statute must grant it in express terms, or by necessary implication, and not in vague or doubtful language; and this rule must be applied, although the legislature, as it may, appropriates property directly, by an act, instead of delegating the right. An alleged authority will be strictly construed against the claimant. (*Erie R. R. Co.* v. *Steward*, 170 N. Y. 172; *Matter of Poughkeepsie Bridge Co.*, 108 N. Y. 483.) The statutes in question are far short of meeting these requirements. They contain no words by which the property is or is to be appropriated, or require no act or effect which can be accomplished only through eminent domain. The claims to be adjudicated by the Board of Claims are those alleged, if any, by reason of the repeal of the chapter 355. The repealing act does not recognize any property right in the corporation, or provide for any appropriation of property. The "liability" of the state, if any, *by reason of the repeal,* is not to be adjudicated unless the alleged claims are filed within six months after the act (chapter 453) takes effect, and is to be determined only upon such legal evidence as would establish a liability "against *an individual* or corporation in a court of law or equity." The acts do not contain the clear and express language by which eminent domain must be authorized.

The existence of the corporation was continued for the purpose of "winding up its affairs." (Laws of 1913, ch. 452, § 2.) It is in existence for the purpose of conserving, preserving and using its property or its avails, for the payment of its liabilities and the distribution of a surplus

among its stockholders. The right to preserve property is a property right equally with the property protected. The corporation, after the repeal of the chapter 355, had the right to preserve from a ground for forfeiture and extinguishment the franchises and rights which it owned, by paying into the treasury of the state the $25,000 requisite for that purpose. It owned them subject to the restrictions and conditions imposed by the chapter, which were neither annulled nor waived by the repealing act. It follows that it was the duty of the state treasurer to receive them.

The orders of the Special Term and Appellate Division should be reversed and the application for a peremptory writ of mandamus should be granted, with costs in all the courts.

WERNER, HISCOCK, CHASE, CUDDEBACK and MILLER, JJ., concur with WILLARD BARTLETT, Ch. J.; COLLIN, J., reads dissenting opinion.

Orders affirmed.